**BITUMINOUS COAL OPERATORS' ASSOCIATION, INC.**

v.

**Joseph P. CONNORS, Sr., et al.**

**Appeal of ASSOCIATED ELECTRIC COOPERATIVES, INC.**

**No. 87–7171.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 18, 1988.

Decided Jan. 31, 1989.

As Amended Feb. 23, 1989.

---

William J. Bethune, with whom James J. Bierbower, Mark B. Bierbower and Israel Goldowitz, Washington, D.C., were on the brief, for appellees.

Hugh J. Beins, John R. Mooney, Paul A. Green and Michael H. Holland, Washington, D.C., were on the brief for amicus curiae, United Mine Workers of America, urging affirmance.

Before MIKVA and D.H. GINSBURG, Circuit Judges, and JACKSON *, District Judge.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge.

The issue in this case is whether a collective bargaining agreement between Associated Electric Cooperative, Inc. (AEC) and the United Mine Workers of America (UMW) required AEC to continue making contributions to the UMW 1950 Pension Trust (the Trust) after the Trust became "fully funded" under federal tax law. In this action brought by the Trustees, the district court held that AEC must continue to make contributions regardless of the funding status of the Trust, and AEC appeals. We affirm.

## I. BACKGROUND

Until 1984, AEC was a member of the Bituminous Coal Operators' Association (BCOA), a multi-employer bargaining association that represents member coal operators in collective bargaining with the UMW. In January 1984, AEC notified the Union that it had resigned its membership in the BCOA and that it wanted to negotiate its own collective bargaining agreement with the UMW when the 1981 agreement between the BCOA and the UMW expired later that year. Shortly thereafter, AEC and the UMW entered into a "Letter of Intent," agreeing in advance that they would later enter into a so-called "me too" agreement identical to the National Bituminous Coal Wage Agreement, the collective bargaining agreement that was then being

John M. Wood, Washington, D.C., for appellant.

* The Honorable Thomas P. Jackson, of the United States District Court for the District of Columbia, sitting by designation pursuant to 28 U.S.C. § 292(a).

628

negotiated between the UMW and the BCOA. (Unless otherwise noted, the national and the me too agreements are referred to collectively and interchangeably as "the Agreement.")

This they did in October 1974. Article XX(d)(1) of the Agreement provides that AEC shall contribute "[i]nto the 1950 Pension Trust ... for the period beginning October 1, 1984, and ending when this Agreement is terminated [on January 31, 1988], $1.11 per ton on each [ton of bituminous coal it produces]."

In January 1987, the Trustees notified all contributing employers that, according to their actuarial calculations, contributions for the plan year ending June 30, 1987 would exceed the Trust's full funding limitation by almost $60 million. Under federal tax law (then, as now) an employer's contributions to a pension fund are, in general, currently deductible only until the fund reaches its "full funding limitation" (or becomes "fully funded"), 26 U.S.C. § 404(a)(1)(A), which occurs when its assets equal its accrued liabilities. 26 U.S.C. § 412(c)(7). Contributions in excess of the full funding limitation may be currently deducted, however, if they are promptly (i.e., within 2½ months of the end of the taxable year) used to fund a current increase in pension benefits. 26 U.S.C. § 412(c)(8); 29 U.S.C. § 1082(c)(8). Excess contributions may also be carried forward and deducted in a subsequent year in which the employer's contribution does not exceed the full funding limitation. 26 U.S.C. § 404(a)(1)(E).

On February 3, 1987, the President of the BCOA notified the Trustees that many of its members believed that they were not required by the Agreement to make further contributions once the Trust had become fully funded and that they intended to cease making contributions when that level was reached. The Trustees, in turn, advised the contributing employers that they interpreted the Agreement to require the $1.11 per ton contribution regardless of whether the Trust was fully funded. AEC thereupon informed the Trustees that it did not consider itself obligated to contribute beyond the full funding limitation and that it would "act accordingly."

In May 1987, the BCOA filed a complaint against the Trustees, seeking a declaration that the Agreement did not require additional employer contributions once the Trust had become fully funded. The Trustees counter-claimed against the BCOA and filed a third party complaint against AEC and other non-BCOA contributing employers, requesting a declaratory judgment to the effect that the employers' obligations to contribute to the Trust continued irrespective of the extent to which it was funded.

The Trustees subsequently filed a motion for partial summary judgment, which the district court granted over AEC's opposition on the ground that, "[h]aving offered no proof of reliance on events occurring at the negotiating table, [AEC is] bound by the terms of the written agreements." 676 F.Supp. 1. Finding the Agreement itself to be "clear and unambiguous," the court held that AEC was obligated to pay $1.11 per ton to the pension plan for the duration of the Agreement, regardless of whether the plan was more than fully funded. AEC has appealed this decision, and the UMW has appeared as an *amicus curiae* in support of the Trustees.

AEC raises four alternative defenses. First, it contends that the Agreement, read as a whole, requires employer contributions only up to the point of full funding. Second, it argues that the Agreement should be interpreted not to require AEC to contribute to the plan beyond the point of full funding because the UMW knew that the agreed-upon contribution rate might result in overfunding but did not share that knowledge with AEC. Third, AEC suggests that, as the result of a mutual mistake, the parties may never have considered the possibility that full funding would be reached and that, now that the Trust has attained that level, the court should fashion a "reasonable term" to govern their rights and responsibilities. Finally, it argues that the district court erred in granting summary judgment without permitting AEC to conduct discovery in order

to determine whether the BCOA and the UMW, in choosing $1.11 per ton as the contribution rate, made a mutual mistake of fact, to wit, that the resulting contributions would no more than fully fund the plan.

The Trustees simply deny outright AEC's first argument; they contend that the express terms of the Agreement unambiguously require employer contributions regardless of the funding status of the Trust. The Trustees then point out that AEC's dispute is not with the Union but with them; argue that section 515 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1145 (1982), authorizes them to enforce the express terms of the Agreement; and therefrom conclude that, although AEC's other arguments might be availing in a suit between it and the Union, they are irrelevant to this case. Finally, the Trustees contend that, in light of the 1988 agreement that AEC and the UMW reached during the pendency of this appeal, the case is now moot. Since the Trustees' contention of mootness goes to our jurisdiction, we turn first to that issue.

## II. Mootness

■ The district court entered its judgment in July 1987. The Agreement was due to expire at the end of January 1988, but in December 1987, AEC signed an "Interim Agreement" that bound it, in advance, to the terms of the 1988 national agreement then being negotiated between the BCOA and the UMW. According to the Trustees, the 1988 agreement, which was put into final form in January of that year, provides that previously made employer contributions in excess of the full funding level are to be used to fund increased pension benefits. Thus, the Trustees argue, by adopting the Interim Agreement, AEC in effect agreed to relinquish the funds that are the subject of this appeal and thereby rendered the appeal moot.

AEC signed the Interim Agreement subject to the written "understanding" that the parties would "in good faith negotiate on the issues outlined in [AEC's] letter to [the UMW] dated November 23, 1987." In that letter, the case now before us was listed as one of the "litigations" that AEC was "open to discuss." It therefore appears that AEC, when it signed the Interim Agreement, specifically reserved the right to pursue this appeal and did not agree to relinquish the funds in dispute (which the district court ordered the Trustees to place in a separate account pending the outcome of this appeal). Accordingly, the case is not moot.

## III. The Terms of the Agreement

Article XX(d)(1) of the Agreement provides:

*During the life of this Agreement, for the periods of time indicated below,* each signatory Employer engaged in the production of coal shall contribute to the Trusts referred to in this Article the amounts specified below based on cents per ton on each ton of two thousand (2,000) pounds of bituminous coal produced by such employer for use or sale ...

\* \* \* \* \* \*

(i) Into the 1950 Pension Trust: for the period beginning October 1, 1984, and *ending when this Agreement is terminated,* $1.11 per ton on each such ton ...

(Emphases added.) The Agreement again refers to the duration of the employers' obligation to make pension contributions in Article XX(d)(7), which provides in relevant part that each employer's obligation "to make full and prompt payments to the Trusts specified in this Article ... shall be a direct and continuing obligation ... *during the life of this Agreement ....*" (Emphasis added.) It is undisputed that, as we mentioned above, the Agreement remained in effect until January 31, 1988, well beyond the time when the Trust became fully funded.

■ AEC argues, however, that the district court incorrectly focused on these provisions alone, and that we must read the 1984 Agreement as a whole and in light of the law relating to it when made; so read, AEC claims, the Agreement does not re-

quire employers to continue making contributions once the Trust has become fully funded. We agree that a collective bargaining agreement must be construed as a whole and in relation to the legal context that existed at the time it was negotiated. *See Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 279, 76 S.Ct. 349, 356, 100 L.Ed. 309 (1956). Even giving full effect to these rules of construction, however, we cannot agree with AEC's reading of the Agreement.

■ In order to broaden our perspective on the contract as a whole, AEC directs our attention to Article XX(a), which states that "[t]he general purpose of the plans referred to in this Article shall be to provide ... pensions for miners upon their retirement;" and to Article XX(h), which provides that:

Notwithstanding any other provisions in this Agreement the Employers hereby agree to fully guarantee the pension and health benefits provided by the 1950 Pension Fund....

In order to fully fund these guaranteed benefits, the BCOA may increase, not decrease, the rate of contributions to be made to the 1950 Pension Fund.... These contributions, which may be adjusted from time to time, shall be made by all Employers signatory hereto during the term of this Agreement.

AEC argues that these references to the purpose of the Trust and to fully guaranteed pension benefits indicate that the parties did not intend employer contributions to accumulate beyond the point of fully funding the benefits provided.

These provisions do suggest that the initial contribution rate of $1.11 per ton was probably chosen by reference to the point of full funding, and that full funding determines the minimum rate of employer contributions; but nothing in these provisions implies that they set a maximum contribution rate. Indeed, the above-quoted portion of Article XX(h) suggests just the opposite. By providing that the Trustees may *"increase, not decrease"* the contribution rate in order to achieve full funding, the Agreement clearly contemplates that $1.11 per ton is the minimum below which contributions may never fall regardless of the level at which the Trust is funded. Moreover, rather than indicating that the full funding limitation restricts the duration for which employer contributions are required, the last-quoted sentence repeats the command of Article XX(d)(1), by providing that the contributions "shall be made by all Employers ... *during the term of this Agreement."* (Emphasis added.)

■ With respect to the legal context in which the Agreement was made, AEC points to certain aspects of federal tax law. Specifically, AEC emphasizes that the tax code permits a current deduction for pension plan contributions only if the plan is below the fully funded level. This constraint, AEC argues, together with several provisions in the Agreement indicating that the employers were concerned with the tax consequences of their contributions, is evidence that the parties did not intend the employers to continue making contributions once the plan was fully funded.

We note preliminarily, however, that the tax laws also mitigate the effect of the ceiling on deductibility in two ways. Employers may carry forward excess contributions in one year and deduct them in later years, 26 U.S.C. § 404(a)(1)(E), or they may deduct such contributions to the extent that they increase employee benefits, in essence raising the point of full funding after the fact. 26 U.S.C. § 412(c)(8); 29 U.S.C. § 1082(c)(8). In addition, the Agreement itself (Article XX(d)(1)(vi) permitted the BCOA unilaterally to reallocate contributions from the pension fund here at issue to another employee benefit fund without increasing its aggregate contribution obligation to the two funds. Thus, to the extent that the second plan was not also fully funded, the employers could preserve the current deductibility of the "excess" contributions to the Trust. To be sure, these mechanisms did not entirely eliminate the possibility that contributions in excess of the full funding limitation would not be fully tax-advantaged, but they appear to have substantially lessened the impact on AEC of the rules against currently deduct-

ing contributions above the full funding level. As a result, the tax consequences for an employer that finds itself obliged to make such contributions were neither so certain nor so drastic when the parties entered into the Agreement (which, we note, predated the enactment of a 10% tax on excess contributions in the Tax Reform Act of 1986, 26 U.S.C. § 4972 (Supp. IV 1988)) that the parties, being rational, must necessarily be assumed to have intended categorically to avoid them.

More fundamentally, however, the parties' attempt to preserve the deductibility of employer contributions in certain situations does not imply that the Agreement limits the contribution obligation to whatever can be currently deducted. On the contrary, it suggests that where the parties did not expressly seek to preserve deductibility, their intent was to require contributions regardless of the tax consequences to the employer. Surely, if Congress repealed the law allowing deduction of contributions to pension funds, AEC would not be heard to say (whatever other claims might be open to it) that its obligation to contribute to the Trust therefore terminated by the terms of the Agreement.

■ Finally, AEC points to Article XX(g)(4), entitled "Administration of Trusts," which provides that the Trustees are

authorized and directed, after adequate notice and consultation with the Employers and Union, to make such changes in the Plans and Trusts hereunder, including any retroactive modifications or amendments, which shall be necessary:

(a) to obtain all necessary determination letters or rulings from the Internal Revenue Service or other applicable federal agencies so as *to ensure ... the deductibility for income tax purposes of any and all contributions made by signatory Employers ...; [or]*

\* \* \* \* \* \*

(d) *to establish the deductibility for income tax purposes of any and all contributions made by the signatory operators to the Pension Trusts ....*

(Emphases added.) AEC argues that this provision gives the Trustees "authority to correct actuarial errors in calculating the $1.11 contribution rate," suggesting that the rate should have been adjusted downward when the Trustees determined that the Trust was approaching the full funding limit.

Upon a hasty reading, it might indeed appear from this provision that the Trustees have the authority, perhaps even the obligation, to modify the contribution rate so as to prevent the Trust from exceeding the full funding limitation, thus ensuring that "any and all contributions made by signatory employers" are tax deductible. Tellingly, however, AEC never makes that claim, for it is apparent from its context that this provision is not a license to the Trustees to make wholesale changes to the Trust solely in order to minimize the tax consequence to the employers. Rather, it is, as the parties entitled it, an administrative provision requiring the Trustees to make only formal and technical modifications to the Trust in order to comply with the often arcane requirements of the tax code. This understanding is reflected in the limiting language of Article XX(g)(4), which confines its scope to "changes in the Plans and Trusts hereunder." Had the parties intended to permit the Trustees to make substantive modifications to the fundamental terms of the Agreement itself—as is necessarily implied by the argument that AEC does make—they would have used broader language.

Thus, having examined the Agreement as a whole and the relevant law at the time it was made, we agree with the district court that the Agreement by its terms plainly requires that employers make the contributions specified without regard to the funding level of the Trust.

## IV. AEC's Other Defenses

AEC also urges that, because the trust is a third party beneficiary of the agreement, it is subject to any defense that AEC might have against the UMW. AEC asserts three such defenses: (1) that it entered into

the Agreement under a unilateral mistake of fact (*viz.*, that the contribution obligation would cease when the Trust reached full funding) of which the UMW was aware, and that AEC is therefore entitled to rely on its interpretation; (2) that AEC and the UMW, or alternatively the BCOA and the UMW, made a mutual mistake of fact to the effect that a contribution of $1.11 per ton would result in no more than full funding, with the result that there was no agreement between the parties to continue contributions after full funding; or (3) that AEC is entitled to discover the bargaining history of the Agreement in order to get evidence that the BCOA and the UMW made such a mutual mistake.

## A. *Unilateral Mistake of Fact*

In response to AEC's first defense, the Trustees argue that, under section 515 of ERISA, a pension trust benefitted by a collective bargaining agreement is not subject to the normal rules governing third party beneficiary contracts and that, under the contract principles properly applicable to collective bargaining agreements, the Trust is authorized to rely on and to enforce the terms of the Agreement. They contend that, whatever the force of AEC's arguments in a suit between AEC and the UMW, they are simply beside the point of this case.

The next issue before us therefore is whether section 515 applies to this case. In order to answer that question, however, we must first explore

### *The Origin and Purpose of Section 515.*

In the usual case, a third party beneficiary that brings a contract claim steps into the shoes of the promisee and is therefore subject to any claim or defense that the promisor would have against the promisee. *See, e.g., Schneider Moving & Storage Co. v. Robbins,* 466 U.S. 364, 370, 104 S.Ct. 1844, 1848, 80 L.Ed.2d 366 (1983). There is no dispute that the Trust is a third party beneficiary of the Agreement, inasmuch as its right to receive contributions from AEC arises solely from that Agreement, although neither the Trust nor the Trustees

are parties thereto. Neither is there any room for dispute, however, that a pension fund is "not a typical third party beneficiary." *Lewis v. Benedict Coal Corp.,* 361 U.S. 459, 468, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960). Like Cinderella's stepsisters, it does not fit comfortably into the shoes of the promisee. *See Southern California Retail Clerks Union v. Bjorklund,* 728 F.2d 1262, 1265 (9th Cir.1984) (range of contract defenses to trustees' collection action should be "severely limited.").

In *Benedict Coal,* the trustees of the UMWA Retirement Fund of 1950 sued to recover delinquent contributions from an employer. The employer argued that it could set such contributions off against the union's liability for the damages it caused by violating the no-strike clause of the collective bargaining agreement. The Supreme Court rejected this defense, finding that the obligation to contribute to the fund should be deemed independent of the no-strike clause in light of the special character of a collective bargaining agreement. 361 U.S. at 468, 80 S.Ct. at 494. For example, because the pension fund was jointly created by the industry and the union, an employer's "interest in the soundness of the fund and its management is in no way less than that of the promisee union," *id.* at 468–69, 80 S.Ct. at 495; moreover, because it was an industry-wide fund, any withheld contributions would impose a burden that would "fall in the first instance upon the employees and their families across the country," *id.* at 469, 80 S.Ct. at 495, and "[u]ltimately this might result in pressures upon the other coal operators to increase their royalty payments to maintain the planned schedule of benefits." *Id.* For these and other reasons grounded in national labor policy, the Court thought it improper to construe the ambiguity created by the silence of the collective bargaining agreement according to principles fashioned for conventional third party contexts.

When it enacted section 515 ERISA, Congress expressly endorsed the Court's approach in *Benedict Coal. See* Remarks of Senator Thompson, 126 Cong.Rec. 23,039 (Aug. 25, 1980). It therefore provided a

statutory procedure intended to simplify the collection of pension contributions and to insulate the plan's entitlement to employer contributions from any potentially off-setting claims against the union. *Id.* Thus, section 515 straightforwardly provides that:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145 (1982). Section 515, like other provisions of ERISA, creates a federal right of action independent of the contract on which the duty to contribute is based and may be enforced by an action brought in the district court. *Id.* at § 1132.

With the origin and purpose of section 515 in mind, we now turn to

### *The Applicability of Section 515 to this Case.*

■ AEC argues that "Congress intended section 515 to apply only to actions by trustees to collect delinquent contributions." Because AEC has continued to make the contributions specified on the face of the Agreement—while disputing that they are in fact due now that the plan is fully funded—and seeks only to have those payments returned, it contends that section 515 is inapplicable to this action. Since nothing in the plain language of section 515 seems to support this contention, AEC points out that the section is entitled "Delinquent Contributions," 94 Stat. 1295, and that there are several references to "delinquencies" in the legislative history of the statute.

It is clear enough that, in enacting section 515, Congress was primarily concerned with overdue contributions; the problem that it sought to address had consistently arisen in situations where a pension fund was seeking to collect overdue payments from employers. Indeed, as AEC points out, all three cases referred to above involved a claim for overdue contributions.

The same problems arise, however, whenever actual contributions are—or would be, if the employer were entitled to withhold facially required amounts—less than expected contributions. As Judge Easterbrook noted for the court in *Robbins v. Lynch,* 836 F.2d 330, 333 (7th Cir.1988), a pension fund must determine benefit levels by reference to actuarial calculations based not only upon past and current contribution levels, but also upon agreed future levels as well. If one employer contributes less than had been expected of it, then a burden falls either on the beneficiaries, whose pensions must be decreased, or on other employers, whose contributions must be increased. It hardly matters whether a pension plan is unable to collect past due contributions that it was expecting, or must return contributions that it has already received and was expecting to have available for the payment of benefits. Thus, we cannot agree that section 515 applies only to delinquent contributions; rather, it entitles pension funds to rely upon, and to enforce, the written terms of collective bargaining agreements insofar as they relate to pension contributions, whether delinquent or anticipated. Therefore, section 515 applies to this case; the only issue that remains is

### *The Effect of Section 515.*

■ In AEC's view, section 515 does nothing more than create, for an employer who already has a contractual duty to contribute to a multi-employer pension fund, a "coextensive statutory duty;" thus, "[i]f no contractual duty to contribute exists, then an employer has no statutory duty to contribute." Under this theory, section 515 would have no independent bearing on this case.

AEC takes too narrow a view of section 515. Under ordinary contract principles, the employer in *Benedict Coal* would surely have been entitled to set off its damages from the union's strike in violation of the collective bargaining agreement against its contribution to the fund. For the Court to have reached the result that it did, it must needs have concluded that the trustees of a

pension fund are in a position superior to that of the union in enforcing the collective bargaining agreement against the employer. Thus, since section 515 was intended, *inter alia*, to incorporate the Supreme Court's decision in *Benedict Coal*, it must be more than a mere codification of an employer's contractual obligations.

AEC next suggests that *Benedict Coal* is distinguishable (and, derivatively, that section 515 is therefore no bar to its defense), on the ground that the employer in that case did not deny that it had originally agreed to contribute the full amount sought by the fund, but only disputed whether it remained obligated for the full amount in light of events subsequent and unrelated to the formation of the contract. In this case, by contrast, AEC's claim is that it was never obligated to contribute more than was required for full funding.

Other circuits have construed section 515 to mean that an employer, when faced with a collection action by the trustees of a pension fund, is barred from raising defenses going to the formation of its contract with the union. In *Southwest Administrators, Inc. v. Rozay's Transfer*, 791 F.2d 769, 773 (9th Cir.1986), the union had promised the employer that, in view of the latter's precarious financial situation, if only the employer would sign the proposed multi-employer collective bargaining agreement, then the trustees of the pension fund would waive a portion of the required contributions. Before the agreement was executed, the trustees advised the union that they would not make such a waiver, but the union did not so advise the employer, which signed the agreement in reliance on the union's earlier promise. When the trustees sued to collect the disputed contributions, the court held that, even though the employer had been fraudulently induced into signing the agreement—and, indeed, although the agreement had been subsequently rescinded in light of the union's fraud—the trustees were nevertheless entitled by section 515 to enforce the written terms of the agreement.

The Seventh Circuit adopted the same approach in a similar situation. In *Rob-*

*bins,* 836 F.2d 330, the court rejected the employer's claim that, notwithstanding the language of a me too collective bargaining agreement purporting to cover all employees, the union had orally agreed that pension contributions would actually be required for only a few of the employees covered by the written terms of the agreement. The court held that, in a suit brought by the trustees of the pension fund, this defense was foreclosed by section 515, under which "pension funds get the benefit of the written terms of [collective bargaining] agreements." 836 F.2d at 333.

We think the reasoning of the Seventh and Ninth Circuits is persuasive in the present context. When the trustees of a pension plan created pursuant to a collective bargaining agreement sue an employer for contributions required by the plan, the employer may not defend on the ground of union misconduct in negotiating the agreement. If it means nothing else, section 515 means that, at least when the Trustees are not implicated in the alleged misconduct, their suit cannot be thwarted by defenses not apparent from the face of the Agreement.

■ Even more fundamentally, AEC's reliance on its intent when it entered into the me too agreement is entirely inapposite. AEC adopts as its own the following statement of the purposes of me too agreements:

[T]he basic purpose of a "me-too agreement" is to allow independent, usually smaller, employers to obtain all the benefits of the master collective bargaining agreement that is negotiated by the principal employers in the industry without having to participate in the industry negotiations, or to engage in separate negotiations, every few years. Thus, the independent employer is assured that (1) it will not be subject to a contract containing more onerous conditions than are applicable to its competitors, (2) it will obtain whatever protections or advantages the industry collective bargaining agreement provides other employers, (3) it will be saved the cost of expensive negotia-

tions, and ... (4) it will be covered by an agreement whenever the rest of the industry is covered and not subject to an agreement whenever the rest of the industry is not.

*Arizona Laborers, Teamsters and Cement Masons Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1518 (9th Cir.1985). In other words, says AEC, it voluntarily tagged along on someone else's contract negotiation in order to avoid the transaction costs and the risks of making a separate agreement on its own.

Seen in this light, AEC's argument that it never intended to agree to continue contributing to the Trust past the point of full funding is peculiar indeed. AEC intended to adopt as its own the agreement between the BCOA and the UMW, and agreed to do so before that agreement had even been reached. It would be passing strange, therefore, if AEC did specifically intend to agree to a particular provision of the resulting Agreement. It is in the nature of a me too contract that the intent relevant to its interpretation is that of the leader (the BCOA), not that of the follower (AEC). AEC's intention is therefore irrelevant.

### B. *Mutual Mistake of Fact*

AEC's first defense of mutual mistake of fact—that the UMW and it entered into the me too agreement under a mutual mistake of fact—is subject to the objection just noted: the relevant intent is not that of the parties to the me too agreement, but that of the parties to the national agreement. AEC's next defense—that the BCOA and the Union made a mutual mistake, such that they never actually agreed that the employers' obligation to contribute would continue past the point of full funding—avoids this difficulty, however.

██ On inspection, however, we see that AEC's defense sounds not at all in mutual mistake of fact. Under that doctrine, a contract may be rescinded if the contracting parties entertained a material mistake of fact that went to the heart of their bargain. The paradigm case is, of course, *Sherwood v. Walker*, 66 Mich. 568, 33 N.W. 919 (1887), in which the court rescinded a contract for the sale of a barren cow when she later proved to be fertile and therefore worth significantly more than the contract price. There the mistake went to the essence of the contract; here there is no such claim. AEC does not argue that the "mutual mistake" entitles it to rescission of the entire Agreement. Rather, it argues that the court should fashion a "reasonable term" to fill the gap left by the parties' failure to anticipate that the Trust would exceed the point of full funding.

At bottom then, AEC is advancing a particular interpretation of the contract, *viz.*, that the parties reached no agreement on the issue whether the employers' obligation to make contributions would continue in this circumstance. Unless we find that they did agree on this point, AEC says, we must either supply the missing term or at least remand the case to the district court so that AEC's discovery into the negotiating history of the Agreement may proceed.

We have determined above, of course, that the Agreement on its face requires the employers to continue to contribute to the Trust even after it has become fully funded. According to AEC, however, even that is not the end of the matter. It seeks evidence that the written contract does not accurately reflect the intent of the parties, or more precisely, that it masks their lack of intent on this question.

In furtherance of this theory, AEC points out that the general rule against receiving extrinsic evidence to alter the terms of a written contract intended by the parties to be an integration is inapplicable to the interpretation of collective bargaining agreements. *See, e.g., Local Union 1395, International Brotherhood of Electrical Workers v. NLRB*, 797 F.2d 1027, 1036 (D.C.Cir. 1986). While AEC's general proposition is valid, we think it is not applicable where section 515 applies. As discussed above, section 515 was adopted in order to ease the burden of uncertainty on the trustees of a pension trust by allowing them to rely upon the language of the agreement itself. This purpose would be frustrated if the trustees were forced to meet defenses that

go to the conduct of the parties to a facially valid trust agreement.

In the terms of section 515, there can be no question that AEC is "obligated" to contribute to the Trust "under the terms of a collectively bargained agreement;" the only question raised by AEC is whether that obligation survives full funding. As we held above, the contract on its face provides that AEC is obligated to make contributions beyond the point of full funding. The requirement of section 515 that AEC make its contributions "in accordance with the terms or conditions of such ... agreement" thus precludes any defense that would avoid that obligation.

■ It is thus clear that AEC's suggestion that it should be permitted to pursue discovery regarding the bargaining history of the national agreement must also fail. Section 515 ends our inquiry with a determination of what is required by the written terms of the Agreement. Since the bargaining history of the national agreement is irrelevant to the facial meaning of its terms, so too is the evidence sought by AEC irrelevant to any material fact in this action, and AEC is therefore not entitled to the discovery it seeks.

■ This is not to say that, if AEC is correct that the UMW defrauded it into entering into an agreement under which it was required to pay to the Trust monies AEC had never intended to obligate itself to pay, AEC is left without a remedy. As both the Ninth and Seventh Circuits have suggested, the proper remedy for such misconduct appears to be not an attack on the Trust, but a suit against the Union. *Robbins*, 836 F.2d at 334; *Southwest Administrators*, 791 F.2d at 777 n. 4. (Indeed, AEC did bring several claims against the Union, but for reasons unknown to us, it later voluntarily dismissed them with prejudice.) Because the evidence sought to be discovered in this case would presumably have some relevance to such an action, discovery (and the action itself) might there be allowed to proceed. This action, however, is at an end.

V. Conclusion

For the foregoing reasons, the order of the district court is

AFFIRMED.