Joseph P. CONNORS, Sr.,
et al., Appellants,

v.

LINK COAL COMPANY, INC., et al.

Joseph P. CONNORS, Sr.,
et al., Appellants,

v.

ISLAND CREEK CORPORATION, et al.

Joseph P. CONNORS, Sr., as Trustee of
the United Mine Workers of America
1950 Pension Trust, et al., Appellants,

v.

DRUMMOND COAL CO., et al.

Nos. 91–7051, 91–7052 and 91–7059.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 1, 1992.

Decided July 24, 1992.

Rehearing and Rehearing En Banc Denied
in No. 91–7051 Sept. 14, 1992.

Julia Penny Clark, with whom Jeremiah
A. Collins, Susan D. Carle, and David W.
Allen, Washington, D.C., were on the brief,

for appellants in Nos. 91–7051, 91–7052 and 91–7059.

Robert C. Bell, Washington, D.C., for appellees. Jonathan D. Schiller, William A. Isaacson, Raymond Paretzky, Washington, D.C., Michael J. Farrell and Barry M. Taylor, Huntington, W.Va., were on the brief for appellees, Island Creek Corp., et al. in Nos. 91–7051 and 91–7059. Thomas P. Gies, Washington, D.C., also entered an appearance, for appellees.

John R. Mooney, with whom Paul A. Green, Robert H. Stropp, Jr. and Earl V. Brown, Jr., Washington, D.C., were on the brief, for appellee United Mine Workers of America in Nos. 91–7051, 91–7052 and 91–7059. Judith A. Scott, Washington, D.C., also entered an appearance for appellee.

Peter Buscemi, Robert A. Dufek, Alissa D. Aaronson and Stanley F. Lechner, Washington, D.C., were on the brief, for amicus curiae urging reversal.

Before: BUCKLEY, WILLIAMS and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

The continual discovery of new coal mines and exhaustion of old ones leads to a very high turnover of employers in the coal industry. Because of this and the mobility of employees, labor and management in the industry have since 1950 worked out a means for assuring workers retirement benefits without linking specific workers to specific employers. They have done this through national, multi-employer agreements between the United Mine Workers of America and a multi-employer association of coal producers, the Bituminous Coal Operators' Association ("the BCOA" or "the Association"). All coal companies that join the agreements pay into the same health and benefit funds at a specified rate per ton of coal produced, and all eligible employees receive benefits from those funds without reference to the employers they happened to be working for at the time of their retirement. The issue here is whether certain coal companies that joined the 1984 Bituminous Coal Wage Agreement were entitled to cut their rate of payment simply by entering into a later agreement with the UMW providing for a lower rate. Because we believe that at an absolute minimum the 1984 Agreement can be construed as barring this sort of spontaneous burden-shedding, we reverse the summary judgment granted by the district court and remand for further proceedings.

The defendants are the UMW itself and several coal companies that, although not members of the BCOA, joined the 1984 Agreement either by becoming actual signatories or by signing so-called "me-too" agreements. "Me-too" agreements have terms identical to the terms of the national agreement, and thus there is no distinction among them concerning employers' contractual rights and obligations. See *Bituminous Coal Operators' Ass'n v. Connors*, 867 F.2d 625, 627–28 (D.C.Cir.1989). The plaintiffs are the Trustees of one of four multi-employer trust funds, the 1950 Pension Trust Fund, which was created in 1950 and has been extended periodically by successive national agreements.

The 1984 Agreement adopted a rate of contribution to the Fund that had been originally chosen in 1978, namely $1.11 per ton of coal produced. The 1984 Agreement itself remained in effect until February 1988, when the UMW and the BCOA entered into a new national agreement that reduced the contribution level to zero. The Fund is and has long been "closed": only workers who retired before 1976 are eligible, and its liabilities may be calculated with a fair degree of actuarial precision.

In January 1987 a group of coal producers who had joined the 1984 Agreement entered into new agreements with the UMW, called Employment and Economic Security Pacts ("the EESPs"). The EESPs were worded so as to take effect once the 1950 Fund was fully funded, i.e., had reserves enough to pay all actuarily expected claims. They provided that, starting then, the employers would contribute to the Pension Fund at a rate of only $0.25/ton. In exchange for agreeing to this reduction, the UMW secured from the coal companies

various advantages for the workers covered by the agreements.

■ In May 1987 the Trustees filed suit against the UMW and the defecting coal companies, seeking to recover the differential between the amount those companies would have paid between the effective date of the EESPs in early 1987, and the cessation of all contributions pursuant to the 1988 agreement, had they continued to contribute at $1.11/ton rather than $0.25/ton—roughly $16 million dollars. The Trustees, claiming to be third-party beneficiaries of the 1984 Agreement, argued that the UMW and the defendant employers were bound to continue paying at the $1.11/ton rate provided for in the 1984 Agreement until that agreement was itself terminated or modified. The district court granted summary judgment for the defendants, evidently on the theory that on the record before it the 1984 Agreement could not possibly be found to lock the defendants into the 1984 Agreement and its $1.11/ton rate. Summary judgment in this context is properly granted only where the provision in question admits only of the interpretation offered by the moving party. E.g., *America First Inv. Corp. v. Goland,* 925 F.2d 1518, 1520–22 (D.C.Cir.1991).

■ In arguing that the defendants were not free to reduce their payments, the Trustees point particularly to a so-called "evergreen clause" that originated in the 1978 agreement and was incorporated in substance into the 1984 Agreement. The clause reads as follows:

> *Any employer* who employed any participant eligible for coverage under, or who received or receives benefits under, the 1950 Pension Plan, or any Employer who was or is required to make, or who has made or makes contributions to the 1950 Pension Plan and Trust, *is obligated and required to comply with the terms and conditions of the 1950 Pension Plan and Trust,* as amended from time to time, *including,* but not limited to, making the *contributions required under the National Bituminous Coal Wage Agreement of 1978,* as amended from time to time, *and any successor agree-*

*ments thereto including,* but not limited to, *the National Bituminous Coal Wage Agreement of 1984.*

Joint Appendix ("J.A.") at 83, 95 (emphasis added). On its face at least, the clause seems to bind parties to the contribution rate provided in the national agreements, including the 1984 Agreement, and thus the $1.11/ton rate, until a successor agreement should provide otherwise.

Other clauses incorporated into the 1984 Agreement confirm that reading. First, Article VI, Section B, paragraph (8) of the Amended 1950 Pension Plan provides that "Contributions to the 1950 Pension Trust ... shall be paid *solely* by the Employers in accordance with ... the National Bituminous Coal Wage Agreement of 1984, as amended from time to time, and any successor agreements to that specific agreement", J.A. at 79 (emphasis added), language which seems to preclude side agreements enabling particular parties to adopt a lower rate. Other language in documents incorporated in the 1984 Agreement specifies that the "me-too" agreements are to be treated as "Wage Agreements" "solely for the purposes of determining who is required to make contributions to, and receive benefits under, the 1950 Pension Trust." J.A. 70, 87. This suggests the parties' anticipation of accession to the agreement solely for purposes of the 1950 Fund, but with the 1984 Agreement (and successors) being the sole source of control of those contributions. Finally, the clauses allowing action to be taken for the coal companies by ones that are parties to the wage agreement and that account for 51% or more of the contributions, and providing for amendment of the agreements, see J.A. 78–79, 83, 94–95, suggest a determination that the agreements should not be undermined by a minority of contributors.

Extrinsic evidence further supports the Trustees' interpretation. At the time of the 1978 Agreement, the Fund's liability exceeded its assets. According to a declaration of Mr. Roger Haynes, a labor negotiator and according to the Trustees the Association's "key spokesman" on issues re-

lating to the Fund, the evergreen clause was added for the precise purpose of making sure that none of the employers accepting the national agreement could reduce their contributions below the rate specified by the national agreement for all. See Declaration of Roger Haynes, reproduced at J.A. at 210–11, 218. Haynes also said that by the time of the negotiations for the 1984 Agreement it was clear that the Fund would reach fully funded status, and yet the UMW at that time refused to include a clause that contributions should cease when it did so. J.A. at 221–22. Even if the text of the evergreen clause permits the defendants' interpretation, this bargaining history suggests that in fact its meaning is what the Trustees claim. See *Local No. 47, Internat'l Bhd. of Electrical Workers, AFL–CIO v. National Labor Relations Bd.*, 927 F.2d 635, 640 (D.C.Cir.1991); *Local Union 1395, International Bhd. of Electrical Workers, AFL–CIO v. National Labor Relations Bd.*, 797 F.2d 1027, 1036 (D.C.Cir.1986).

■ Rather than provide their own interpretation of the *language* of the evergreen clause or offer competing extrinsic evidence, the defendants argue mainly that under the Trustees' reading the evergreen clause is a waiver of their statutory right to enter into collective bargaining (on the subject of contribution to the Fund) and is thus covered by the labor law doctrine that waivers of statutory rights can be effective only if "clear and unmistakable". *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983).[1]

■ The doctrine of "clear and unmistakable" waiver, however, is inapplicable here. Defendants' invocation of the doctrine is based on the notion that under the Trustees' reading of the evergreen clause, the defendant companies and union waived

the right to bargain on the subject of contributions to the 1950 Fund. But to the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining. Such issue resolutions are not waivers within the meaning of the doctrine.

Recently, in *Department of the Navy, Marine Corps Logistics Base, Albany, Georgia v. FLRA*, 962 F.2d 48 (D.C.Cir. 1992), we identified waiver quite carefully, saying that "when a union *waives* its right to bargain about a particular matter, it surrenders the opportunity to create a set of contractual rules that bind the employer, and instead cedes full discretion to the employer on that matter." *Id.* at 57 (emphasis in original). And we distinguished between waiving an issue and resolving it:

> A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain over a matter; but where the matter is covered by a collective bargaining agreement, the union *has exercised* its bargaining right and the question of waiver is irrelevant.

*Id.* (emphasis in original). Accord *Local Union No. 47*, 927 F.2d at 641 (when contract defines rights, "it is incorrect to say the union has 'waived' its statutory right to bargain; rather, the contract will control and the 'clear and unmistakable' intent standard is irrelevant").

■ It is hard to find any waiver in sight. In the 1984 Agreement the UMW and the employers appear simply to have agreed on a criterion for determining the employers' pension fund contribution, namely the figure embodied in the 1984 Agreement ($1.11), subject to such changes as might be agreed upon by (1) the UMW itself and (2) the BCOA—an organization which on this issue would seem to have interests virtually identical to those of the defendant employers. The defendants do

---

1. To the extent that defendants rely on a notion that bargaining history cannot play a role in satisfying that standard (if applicable), they are plainly wrong. *Local Union No. 47*, 927 F.2d at 640; see also *Local Union 1395*, 797 F.2d at 1036 ("The intent of the parties to collective bargaining agreements [even for purposes of "clear and unmistakable waiver"] is not to be discerned by

reference to 'abstract definitions unrelated to the context in which the parties bargained,' especially where bargaining history is crucial to an understanding of that intent.") (quoting *NLRB v. C & C Plywood Corp.*, 385 U.S. 421, 430, 87 S.Ct. 559, 565, 17 L.Ed.2d 486 (1967)); *id.* at 1036 n. 9.

not explain how, by their standards, any contractual resolution of an issue could escape having to satisfy the *Metropolitan Edison* criteria for waivers. Incidentally, a matter may be "covered by" a collective bargaining agreement even though the agreement does not specifically address the particular subject matter at issue. *Department of the Navy*, 962 F.2d at 58; see also *id.* at 59.

Nor is the Trustees' view of the 1984 Agreement undermined by the fact that the EESPs took effect only after the Fund was fully funded. Nothing in the words of the 1984 Agreement suggests that the parties' obligations should cease at the moment of full funding. See *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 629–31 (D.C.Cir.1989). Defendants implicitly acknowledge the fact by pointing elsewhere for support, arguing that the Trustees' post-agreement conduct—their pursuit of withdrawing employers under provisions of the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. §§ 1381–1453—somehow reflects an understanding to that effect. Brief of Appellees Island Creek Corp., et al. at 40–43. Whatever the force of that extrinsic evidence—certainly *not* enough to justify summary judgment against the Trustees—it leaves intact the obvious reason why the parties may have intended the obligation to survive full funding. Withdrawal at the option of each employer would leave those slowest to withdraw—the most dutiful, perhaps, or the ones using the most cautious calculations to determine full funding (the 1984 Agreement itself supplies no formula)—bearing a disproportionate share of the load. Quite apart from allowing some employers to free ride on the contributions of others, the temptations of early withdrawal might jeopardize the Fund. Thus, the UMW's interest in the pensioners' welfare, and the coal companies' competitive interest in equal treatment, both argued for termination by agreement. See *Schneider Moving & Storage Co. v. Robbins*, 466 U.S. 364, 373, 104 S.Ct. 1844, 1849, 80 L.Ed.2d 366 (1984); *Lewis v. Benedict Coal Corp.*, 361 U.S. 459, 469, 80 S.Ct. 489, 495, 4 L.Ed.2d 442 (1960).

Thus the parties may well have reasoned that when full funding had clearly been obtained, the parties' incentives to agree on termination would come into play, leading to an orderly end of contributions; any deviation from hitting "full funding" right on the nose would go to the benefit of the pensioners. Indeed, the 1988 agreement converted the Fund's surplus into added pension benefits for its eligible retirees. See J.A. at 95; see also *Bituminous Coal Operators' Ass'n*, 867 F.2d at 629.

■ Defendants assert that insofar as plaintiff Trustees assert rights as third-party beneficiaries of the 1984 Agreement they overlook the doctrine that ordinary TPB law may not be used "to interpret collective agreements in a manner contrary to federal labor policy", Brief of Island Creek Corp., et al. at 24, citing *Schneider Moving & Storage* and *Lewis*. But in fact in both cases the Court found that the TPBs in question, there as here trustees of funds for the benefit of employees and their families, should enjoy a status *superior* to that of ordinary TPBs, and should be free of the usual rule that any defense a promisor would have against the promisee can be invoked against the TPB. *Schneider Moving & Storage*, 466 U.S. at 370–71 & n. 11, 104 S.Ct. at 1848 & n. 11; *Lewis*, 361 U.S. at 468–69, 80 S.Ct. at 495.

Finally, defendants suggest that ordinary TPB law allows the promisor and promisee to modify their agreement up to the point where the TPB has acted in reliance upon the agreement. But the issue of when the parties may amend over a TPB's objection, see generally 3 E.A. Farnsworth, Farnsworth on Contracts § 10.8 (1990) (setting forth alternative rules), is not really in question, for in this case it is understood that even an employer who joins by virtue of a "me-too" agreement is a party to the full 1984 Agreement, and such an employer is tied contractually to all other joining employers, including those who did *not* strike a deal with the UMW to reduce their payments. Without their agreement (or amendment by the

terms of the trust), there is no amendment by the original promisors and promisees.

\* \* \*

We leave further exploration of these issues to the district court. In light of the above, it is clear that evergreen clause is, at the very least, susceptible to the Trustees' interpretation. Accordingly, the district court's grant of summary judgment in favor of the defendants is

*Reversed and Remanded.*