KenAMERICAN RESOURCES,
INC., et al., Appellants

v.

INTERNATIONAL UNION, UNITED
MINE WORKERS OF AMERICA,
Appellee.

No. 96–7101.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 11, 1996.

Decided Nov. 12, 1996.

John G. Roberts, Jr., argued the cause for appellants, with whom Daniel Francis Attridge, Donald G. Kempf, Jr., John Stiles Irving, Jr., Gary W. Brown, and Jonathan Saul Franklin, Washington, DC, were on the briefs.

John R. Mooney, Washington, DC, argued the cause for appellee, with whom Grant F. Crandall, Charleston, WV, was on the brief. Robert H. Stropp, Jr., Washington, DC, entered an appearance.

Harold P. Coxson, Maurice Baskin, Rosemary M. Collyer, and Mark E. Baker, Washington, DC, were on the joint brief for amici curiae National Association of Manufacturers, et al.

Jonathan Hiatt, Boston, MA and Kathy L. Krieger, Washington, DC, were on the brief for amicus curiae American Federation of Labor and Congress of Industrial Organizations.

Before: SILBERMAN, GINSBURG, and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge SILBERMAN.

SILBERMAN, Circuit Judge:

Appellants are the parent and subsidiary corporations of two groups of coal companies—the unionized Ohio Valley companies and the nonunion KenAmerican companies—and Robert Murray, the individual who owns the stock of each group's parent corporation, but, for the purpose of clarity, we use appel-

lants to refer only to the KenAmerican companies and Murray individually. The district court granted summary judgment to the International Union, United Mine Workers of America (the Union), enforcing an arbitrator's award requiring a KenAmerican company, pursuant to an agreement between the Union and the Ohio Valley companies, to hire displaced workers from an Ohio Valley company. Since the district court incorrectly deferred to the arbitrator on the issue of whether Murray and the KenAmerican companies had agreed to arbitrate this dispute, and since Murray and the KenAmerican companies are not bound by the agreement between the Union and the Ohio Valley companies, we reverse.

## I.

Robert Murray wholly owns, and serves as the President and CEO of, Ohio Valley Resources, Inc. and Coal Resources, Inc. Ohio Valley Resources is the parent company of the three other Ohio Valley companies, including Ohio Valley Coal Company; employees of the Ohio Valley companies are represented by the Union. Coal Resources is the parent company of the seven other KenAmerican companies, including KenAmerican Resources, Inc. (KRI). KenAmerican employees are not members of the Union.

In 1993, the Union and the Bituminous Coal Operators Association, Inc. (the Association), a multi-employer bargaining group which does not include the Ohio Valley companies, after a long strike, and with the aid of the noted mediator William J. Usery, reached an agreement (the Association Agreement). One of the issues on which the negotiations focused was the proclivity of some companies to operate both union and nonunion mines, the latter allegedly to avoid the obligations of past collective bargaining agreements. Accordingly, the Association Agreement included a Memorandum of Understanding Regarding Job Opportunities (MOU). Under the MOU, each signatory was to sign as a limited agent of its *nonsignatory* parent and its *nonsignatory* subsidiaries, thereby obliging those nonunion members of a family corporate structure to offer three out of every five new classified job openings to qualified laid-off or active miners from the signatory company's bargaining unit. This obligation applied to new coal mining operations opened after execution of the Association Agreement. The MOU authorized the Chairman of the Association Agreement's Labor Management Policy Committee—who, it turns out, is Mr. Usery—to arbitrate disputes alleging a breach of the MOU.

The Ohio Valley companies, through their President Murray, prior to the Union's strike against the Association, signed a "me too" agreement with the Union obliging the companies to adopt the agreement that came out of the industry-wide negotiations. Subsequent to the execution of the Association Agreement, KRI was incorporated as a subsidiary of Coal Resources to construct and operate a mine, Paradise No. 11, in Kentucky; it did not offer jobs to Union workers in Ohio Valley companies, prompting the Union to contend that KRI failed to perform its obligations under the MOU. The Union initiated arbitration proceedings against all of the Ohio Valley and KenAmerican companies. The KenAmerican companies claimed they were not covered by the MOU and therefore were not bound to arbitrate the dispute because although the Ohio Valley companies had agreed to be bound to the Association Agreement, they did so in a fashion that limited their obligation so as not to extend to the KenAmerican companies. The arbitrator ruled otherwise; he determined that Murray, who signed the several agreements which we examine below as the President of the Ohio Valley companies, was himself a "parent" within the meaning of the MOU and therefore all of his companies were covered by the MOU. Accordingly, the arbitrator ordered Murray and the KenAmerican companies to ensure that three out of five new and existing classified jobs at KRI were filled with workers from Ohio Valley Coal.

Appellants sued the Union in district court, challenging the arbitration award on grounds that they had never agreed to arbitrate and that, in any event, the MOU is illegal under § 8(e) of the National Labor Relations Act (a "hot cargo" agreement). *See* 29 U.S.C. § 158(e) (1994). On cross motions for sum-

mary judgment, the district court granted summary judgment to the Union.

## II.

Appellants put two main arguments to us; first, that they never agreed at all to the MOU—only the Ohio Valley companies were bound by it—and therefore they did not agree to arbitrate disputes as to its interpretation. They assert that the district judge erroneously deferred to the arbitrator on the issue of arbitrability. Second, the Association Agreement, as interpreted by the arbitrator, may not be enforced because it violates § 8(e) of the National Labor Relations Act. They contend that the Agreement is not one designed to preserve bargaining unit work but rather to reach out and affect the labor relations of a neutral employer, and that the KenAmerican companies are "neutrals," as § 8(e) has been interpreted, with regard to the Union's dispute with the Ohio Valley companies. The Union, of course, counters both arguments, but it includes an alternative claim against the Ohio Valley companies and Murray. The Union argues that if we determine that appellants never agreed to arbitrate, the Ohio Valley companies and Murray are liable in damages and therefore, presumably, the case should be sent back to the arbitrator to affix such damages.[1]

We take up first, as we must, the question of arbitrability. It is now settled that a federal court must decide *de novo* whether the parties agreed to arbitrate a particular dispute, unless the parties unmistakably indicate that arbitrability issues are to be decided by an arbitrator. *AT&T Technologies, Inc. v. Communications Workers of America,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418–19, 89 L.Ed.2d 648 (1986). This is particularly true where one party denies that it has ever agreed to the collective bargaining agreement. In such a case, " 'the analysis is a simple one; if the parties disagree as to whether they ever entered into any arbitration agreement at all, the court must resolve that dispute.' " *National R.R. Passenger*

*Corp. v. Boston & Maine Corp.,* 850 F.2d 756, 761 (D.C.Cir.1988) (quoting *Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 v. Interstate Distributor Co.,* 832 F.2d 507, 510 (9th Cir.1987)); *see A.T. Massey Coal Co., Inc. v. International Union, United Mine Workers of America,* 799 F.2d 142, 146 (4th Cir.1986), *cert. denied,* 481 U.S. 1033, 107 S.Ct. 1964, 95 L.Ed.2d 536 (1987). In so doing, we may not afford any deference at all to the arbitrator's view on that issue. Although the Union points to the ample body of law that calls for wide deference to an arbitrator's interpretation of a collective bargaining agreement on the *merits,* it does not really contest appellants' main argument—that we must decide the arbitrability question without regard to the arbitrator's views—nor did the district judge; indeed, he explicitly recognized his duty. But he determined that "the *Ohio Valley* companies 'clearly and unmistakably' agreed to submit to binding arbitration *any* dispute growing out of the 1993 [Association Agreement] and the ... MOU." Then having decided, in his view, the issue of arbitrability, he went on to afford "great deference" to the arbitrator's interpretation of the MOU, including the arbitrator's definition of the word "parent," which, again in his view, extended the MOU's obligations to appellants.

We think the district court's reasoning is flawed. That the Ohio Valley companies were bound by the MOU and therefore agreed to arbitrate disputes as to its meaning decidedly does not mean that the KenAmerican companies and Murray were similarly bound. And the question whether the latter were or were not bound *is* the arbitrability issue in this case. *See AT&T Technologies,* 475 U.S. at 648, 106 S.Ct. at 1418. If appellants never agreed to the MOU, they can hardly be thought to have agreed to arbitrate disputes as to its meaning. The district court thus did, as appellants argue, erroneously defer to the arbitrator on the core aspect of the arbitrability issue.

\*    \*    \*    \*    \*    \*

---

1. Appellants do not explicitly contend that any interpretation of the agreements that would lead to damages against Ohio Valley and Murray

would still be a violation of § 8(e), but it would appear that their same arguments would apply.

Whether appellants agreed to be bound by the MOU, under ordinary contract law, turns on a careful examination of the agreements Murray signed on behalf of the Ohio Valley companies; there are no material disputes of fact, and therefore no reason to remand the arbitrability issue to the district court.[2] The Union argues that these agreements, fairly read, indicate that the Ohio Valley companies as agents bound Murray (and thereby KRI) as the principal. But if, as we conclude, those agreements never purported to cover the KenAmerican companies or Murray personally, then it cannot be said that appellants were obliged to arbitrate this dispute.

The key document is the "me too" agreement signed in early 1993, which has two parts: one called an interim agreement, and the other, somewhat confusingly, also called a memorandum of understanding (which we shall refer to as the "memo"). The memo was quite specific as to what Murray, in behalf of the Ohio Valley companies, was agreeing to put under the eventual Association Agreement. It stated that the product of the Association's negotiations with the Union would cover "the current and future coal lands and operations of the [Ohio Valley companies]," which were identified in fine detail phrased in metes and bounds (including maps). The "me too" agreement thus covered the holdings of the *Ohio Valley companies* only—including, rather pointedly, *past* holdings of Coal Resources that had been actually transferred to the Ohio Valley companies. Nowhere does the memo even suggest that the agreements apply to other companies; indeed, its very precise delineation of what it does cover necessarily implies that it does not reach anything else. We do not see how it can be thought, then, that Murray personally or the KenAmerican companies agreed in the "me too" agreement to be bound by it and therefore the Association Agreement.

The Union contends that even if the "me too" agreement limited the prospective coverage of the Association Agreement, as appellants argue, it was only because neither party anticipated that the multi-employer bargaining would result in the broad-reaching MOU, which, as interpreted by Mr. Usery, could reach an individual as a parent. Implicitly, then, the Union is arguing that Ohio Valley's subsequent adoption of the Association Agreement modified and broadened the coverage terms set forth in the "me too" agreement. But we find no support for this claim which is, in effect, an argument that the parties agreed to a novation.

As required by the "me too" agreement, the Union forwarded form adoption pages relating to the Association Agreement to Murray. These pages indicated that *the signatories* were agreeing to "each and every term" of the Association Agreement, "including Memoranda of Understanding, attached hereto." But Murray signed in his capacity as President and CEO of each of the Ohio Valley companies, and modified the pages before he signed to provide that the adoption agreement also incorporated "the 1993 Memorandum of Understanding" (the memo portion of the "me too" agreement). He even noted in the letter returning the modified pages to the Union that the "me too" agreement "is a part of the [Association Agreement] for our companies and, indeed ... supersedes ... the [Association Agreement] in a few instances." The Union *agreed* to the modified signature pages. The Union subsequently sent the all-important MOU itself to the Ohio Valley companies to be executed. Murray, again in his capacity as President and CEO of each Ohio Valley company, signed the MOU but modified it to provide that Ohio Valley Resources was signing as the limited agent of no company; that the subsidiary Ohio Valley companies were signing as the limited agent of Ohio Valley Resources alone; and that the Ohio Valley companies were not binding any nonsignatory companies to the MOU. (The Union never signed that document.)

It appears then that Murray was quite careful to avoid agreeing to expand the anti-

---

2. A federal court interpreting a collective bargaining agreement applies federal common law of contracts, *Textile Workers v. Lincoln Mills*, 353 U.S. 448, 451, 77 S.Ct. 912, 915, 1 L.Ed.2d 972 (1957), but there is no dispute between the parties as to the principles of contract law that govern.

cipatory coverage he had agreed to in the "me too" agreement. By contrast, the Union concurred in and signed his modification of the adoption agreement, which explicitly referred back to the "me too" agreement. We therefore think that it is rather plain that neither Murray personally nor KRI were ever covered by the MOU. This case differs importantly from *Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625 (D.C.Cir.1989), relied upon by the Union. In *Connors*, we held that the intent of a party that had agreed via a "me too" agreement to be bound by a national agreement was irrelevant in construing a term in the national agreement. *Id.* at 634–35. Here, however, the intent of the parties—as evidenced by the "me too" agreement—is not being used to construe a term in the MOU, but to determine which parties actually agreed to be bound by the MOU. Appellants did not sign an open-ended "me too" agreement as in *Connors*, but instead specifically limited the coverage of the Association Agreement.[3]

\*　\*　\*　\*　\*　\*

It will be recalled that the Union presented an alternative claim for damages against the Ohio Valley companies in the event we were to determine that KRI and Murray were not bound by the MOU. Although the theory of the claim is not precisely set forth, as we understand the Union's agreement, it is based on the notion that Ohio Valley accepted an obligation—to "deliver" the KenAmerican companies and Murray personally—which it did not perform. One could conceive of a case where such a theory of liability would be available and therefore a remand would be appropriate—if, for instance, an agent purported to bind a principal without having authority—but that is not open here. The Union's sole claim, indeed, the only claim that is possible, is that Murray, as President of Ohio Valley companies, bound the KenAmerican companies and himself to the MOU. Once we conclude, as we do, that Murray did not purport to bind appellants, indeed he carefully avoided bind-

ing them, there is no possibility of a claim for damages; that claim is precluded by our holding on the arbitrability issue. It is therefore unnecessary for us to remand the case, and, of course, it is also unnecessary to consider whether the arbitrator's interpretation of the MOU violates § 8(e) of the NLRA.

Accordingly, we reverse the district court's grant of summary judgment to the Union and grant summary judgment to appellants.

*So ordered.*

---

3. Our opinion, of course, has no bearing on the arbitrator's interpretation of the word "parent" in the MOU as it relates to other signatories of that agreement. It is worth noting that the interests of members of the Association may well be quite different than the Ohio Valley companies. The former might be sympathetic to the arbitrator's decision applying the MOU to Murray personally.