

1996 Decisions

6-12-1996

# Cent PA Teamsters v. McCormick Dray Line

Precedential or Non-Precedential:

Docket 95-1740

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Cent PA Teamsters v. McCormick Dray Line" (1996). *1996 Decisions.* Paper 150.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/150

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


No. 95-1740


CENTRAL PENNSYLVANIA TEAMSTERS PENSION FUND;
CENTRAL PENNSYLVANIA TEAMSTERS HEALTH & WELFARE FUND;
JOSEPH J. SAMOLEWICZ

v.

McCORMICK DRAY LINE, INC.;  JAMES WEBB

                    Central Pennsylvania Teamsters
                    Health and Welfare Fund and
                    Joseph J. Samolewicz,

                         Appellants



Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 93-2118)


Argued March 13, 1996


Before:  NYGAARD, SAROKIN, and ALDISERT, Circuit Judges

(Filed June 12, 1996)


                         Frank C. Sabatino (argued)
                         Schnader, Harrison, Segal &
                              Lewis
                         1600 Market Street, Suite 3600
                         Philadelphia, PA  19103

                         Attorney for Appellants


                         Craig S. Hudson (argued)
                         Marshall, Dennehey, Warner,
                              Coleman & Goggin

1845 Walnut Street
Philadelphia, PA  19103

Attorney for Appellees


OPINION OF THE COURT


SAROKIN, Circuit Judge.

This case poses the question of whether a provision in a collective bargaining agreement which establishes eligibility for employee participation in a health and welfare plan can be reformed as the result of mutual mistake by the contracting parties.  Because this case involves a multiemployer plan, we conclude that reformation is not available and that third party beneficiaries to the underlying agreement are entitled to rely on its plain language notwithstanding that such language was the result of the mistake or negligence of the contracting parties.

Here, the Central Pennsylvania Teamsters Health & Welfare Fund ("Welfare Fund") seeks to recover delinquent funds from McCormick Dray Lines, Inc. ("McCormick").  McCormick argues that these funds are not delinquent because they are sought pursuant to a clause in a collective bargaining agreement that McCormick avers was the result of a "mutual mistake" or a "scrivener's error."  The district court agreed and ruled in favor of McCormick.  We reverse.

I.

McCormick is a trucking company employing approximately sixty drivers, of whom twenty-two are union drivers.  The union drivers are represented by Teamsters Local Union No. 764 ("Local 764" or "the union").  From the 1970s until 1991, McCormick was a party to a series of collective bargaining agreements with Local 764.  During that period, Charles Greenawalt was the President and Business Representative for Local 764, and he was the principal negotiator for Local 764 in the collective bargaining negotiations.  James Webb has been President of McCormick since 1984, and in that role negotiated with the union on behalf of McCormick.

Included in these bargaining agreements were provisions requiring that McCormick make monthly contributions to the Welfare Fund on behalf of the union drivers for purposes of providing them with medical benefits for themselves and their families.  Typically, just before the time that a prior collective bargaining agreement would expire, the Welfare Fund would send to Local 764 "suggested" health and welfare language for the collective bargaining agreement.  Greenawalt would then ask his secretary to incorporate the "suggested" language into a draft of the new collective bargaining agreement.  If the parties to a collective bargaining agreement wanted changes made to this "suggested" language, they would negotiate those changes

themselves and then submit them to the Welfare Fund for approval.

In 1983, McCormick and Local 764 negotiated a change in the employee Eligibility Clause to the Health and Welfare portion of their contract.  Specifically, the Eligibility Clause in the 1983 Agreement was negotiated to include the following language:

Section 2.  Eligibility of Employees

(A)  An employee shall be deemed to be an eligible member employee if such employee has worked at least 60 hours for the employer during the preceding month . . . .

The Sixty

(B)  Any newly hired employee shall qualify as an eligible member employee after forty-five (45) working days or on the sixtieth calendar day whichever comes first.

Joint Appendix ("JA") at 484.  Before this negotiated clause could be included in the collective bargaining agreement, Greenawalt had to obtain approval from the Welfare Fund.  The fund did agree, reluctantly, to approve the language.  This same language then also appeared in the 1985 collective bargaining agreement.

Greenawalt testified that just before the Union's 1985 collective bargaining agreement was about to expire, he received suggested language from the Welfare Fund, as per usual, and this language was then incorporated into the draft contract. Afterwards, Greenawalt and Webb negotiated over the dollar amount McCormick would be required to contribute to the Welfare Fund. Webb never made any requests to change any of the other Welfare Fund language, including the Eligibility Clause.

Once Greenawalt and Webb agreed to the essential terms of the contract, Greenawalt sent Webb a copy of the 1988 Agreement accompanied by a letter asking that Webb "[p]lease review [the Agreement] and get back to [him] with any additions or corrections which [Webb] fe[lt] need[ed] to be made" prior to signing the agreement.  Webb testified that he never specifically checked the Eligibility Clause of the contract because it had not been the subject of specific negotiations.  No changes were made to the Fund's proposed language, and the 1988 Agreement was formally executed.

About one year following the execution of the 1988 Agreement, Webb noticed that the language in the Eligibility Clause of Article XII did not include the same language that had appeared in the past two collective bargaining agreements. Specifically, the Eligibility Clause in Article XII provided in relevant part:

Section 2.  Eligibility of Employees

A.  Any newly hired employee shall qualify as an eligible member employee as of the first day of the month immediately following his employment if such

    employee meets the requirements of Subsection (B) next
    below.

    B.  An employee shall be deemed to be an eligible
    member employee if such employee has worked at least 60
    hours for the Employer during the preceding month.
JA at 202-03.  Unlike the Eligibility Clause that appeared in the
1983 and 1985 Agreements, this clause included no additional
requirement that the employee work at least 45 days prior to
eligibility.

    Webb testified that he called John Kleinfelter, the
administrator of the Welfare Fund, to find out how the mistake
had occurred, and that "John kind of pooh-poohed and ha-ha'd and
laughed about it."  JA at 302.  Webb also contacted Greenawalt,
informing him that, unless Local 764 agreed to reform the
Eligibility Clause to be identical to that in the 1983 and 1985
Agreements, he would pursue a formal grievance under the parties'
collective bargaining agreement.  Greenawalt testified that he
"was as surprised as [Webb] was" to learn of the actual language
in the Eligibility Clause.  JA at 416.  However, he further
testified that the point at which the error was discovered was so
long after the Agreement was signed that he was reluctant to
change it unilaterally because he feared the union could be held
liable by the Welfare Fund.  Therefore, on August 18, 1989
Greenawalt formally advised Webb that Local 764 would not agree
to modify the Eligibility Clause and that McCormick should file a
grievance with the American Arbitration Association if it wished
to pursue the issue.

    Webb did not pursue a formal grievance.  Instead, McCormick
adopted a new practice of notifying each newly hired employee
that there had been an error in the 1988 Agreement, explaining to
each of them that they would become eligible for health and
welfare benefits only after they had completed their 45th work
day or their 60th calendar day and requiring them to sign a form
acknowledging that they were aware of this.

    In 1991, auditors conducted a routine examination of
McCormick's payroll records on behalf of the Welfare Fund and the
Pension Fund.  This payroll audit revealed that McCormick had not
been making contributions on behalf of newly hired employees in
accordance with the Eligibility Clause as it actually appeared in
the 1988 Agreement.  In particular, the auditors discovered that
McCormick owed $27,930.00 in delinquent contributions to the
Welfare Fund.  There is no dispute that under the plain language
of the 1988 Agreement, McCormick owes the $27,930.00.

    Webb testified that after learning of the audit, he again
called John Kleinfelter at the Welfare Fund.  He testified that
during his conversation, Kleinfelter told him "[W]e haven't come
after you for the money, have we? . . . [W]ell you know it was a
mistake."  JA at 309.  Greenawalt testified, however, that he
spoke to Kleinfelter about the language, too, and that
Kleinfelter never told him it was a mistake but that it was the
standard language they sent at the end of every contract and that
if McCormick had not wanted to agree to it, they should have gone
back to the Welfare Fund for approval to change it.

After failing in its efforts to recover the delinquent funds, the Welfare Fund commenced this action against McCormick on April 22, 1993.  Meanwhile, in 1991, Donald Deivert replaced Greenawalt as President of Local 764.  On June 17, 1993 -- almost two months after the Welfare Fund filed the instant action in federal court -- Webb executed a Memorandum of Agreement with Deivert, acknowledging that there was an error in the 1988 Agreement.  Deivert's testimony, however, indicates that he signed this Agreement out of fear that he and the Union would be sued and the union drivers would lose their jobs if he did not.

In March of 1994, both parties filed cross-motions for summary judgment.  The district court granted summary judgment in favor of McCormick, finding that the Eligibility Clause in the 1988 Agreement was subject to reformation because the language in the clause was the result of a mutual mistake or a scrivener's error.  Central Pennsylvania Teamster Pension Fund, et al. v. McCormick Dray Lines, Inc., No. 93-2118, slip op. at 16 (E.D. Pa. Nov. 21, 1994) (hereinafter "Memorandum Opinion").  This appeal followed.

II.

The district court had jurisdiction over this action brought under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C.   1001 et seq. pursuant to 28 U.S.C.   1331.  This court exercises appellate jurisdiction pursuant to 28 U.S.C.   1291.

Our review of the district court's order for summary judgment is plenary.  Stroehmann Bakeries v. Local 776, 969 F.2d 1436, 1440 (3d Cir.), cert. denied, 506 U.S. 1022 (1992).  We thus apply the same test applied by the district court: (1) are there no material facts in dispute; and (2) is one party entitled to judgment as a matter of law?  Id. at 1441 (citing Fed. R. Civ. P. 56(c); International Union, United Mine Workers of Am. v. Racho Trucking Co., 897 F.2d 1248, 1252 (3d Cir. 1990)).

III.

In this dispute, as in others in which welfare funds seek to recover payments that are delinquent under the terms of collective bargaining agreements with unions, the Welfare Fund occupies the position of third-party beneficiary -- i.e. the beneficiary of the agreement between the union and McCormick. See, e.g., Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992).  Third-party beneficiaries are generally subject to the same defenses that the promisor (here McCormick) could raise in a suit by the promisee (here the union).  See id. (citing J. Calamari & J. Perillo, The Law of Contracts   17-10 (3d ed. 1987)).  Such defenses include fraud in the inducement, breach of contract and mutual mistake.

In 1960, however, the Supreme Court held that the rule is different for employee benefit plans that are third-party beneficiaries pursuant to collective bargaining agreements.  In Lewis v. Benedict Coal Corp., 361 U.S. 459, 470-71 (1960), the Court held that an employer could not raise the union's breach of a collective bargaining agreement as a defense against an employee benefit plan suing for delinquent contributions unless such a defense was preserved in "unequivocal words" in the

collective bargaining agreement.

In arriving at its conclusion, the Court explained that a "collective bargaining agreement . . . is not a typical third-party beneficiary contract." Id. at 468. Rather, the Court noted the economic reality that many persons and entities have a direct interest in the viability of a multiemployer plan: "If Benedict and other coal operators having damage claims against the union for its breaches may curtail royalty payments, the burden will fall in the first instance upon the employees and their families across the country." Id. at 469. Furthermore, other employers would be required to increase their royalty payments to maintain the planned schedule of benefits. Id.

The principle the Supreme Court set forth in Benedict Coal -- i.e., that a breach by a union does not relieve the employer of its obligations to make pension contributions to a multiemployer welfare fund -- was ratified by Congress through the enactment of section 515 of ERISA, which reads as follows:

> Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

29 U.S.C. 1145; see 126 Cong. Rec. 23,039 (1980) (remarks by Rep. Thompson) (endorsing the reasoning of Benedict Coal in passing section 515).

Congress's purpose in enacting section 515 was to allow multiemployer welfare funds to rely upon the terms of collective bargaining agreements and plans as written, thus "permit[ting] trustees of plans to recover delinquent contributions efficaciously, and without regard to issues which might arise under labor-management relations law . . . ." 126 Cong. Rec. 23,039 (1980) (remarks by Rep. Thompson). Congress noted that employer delinquency "detract[ed] from the ability of plans to formulate or meet funding standards and adversely affect[ed] the financial health of plans." Id. With the passage of section 515, Congress sought to ensure that benefit plans are able to rely on contribution promises of employers "because plans must pay out to beneficiaries whether or not employers live up to their obligations." Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990) (citing Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Serv., Inc., 870 F.2d 1148, 1151 (7th Cir. 1989) (en banc)).

The Seventh Circuit has explained that under section 515, "[t]he pension or welfare fund is like a holder in due course in commercial law . . . [and thus] entitled to enforce the writing without regard to understandings or defenses applicable to the original parties." Gerber Truck, 870 F.2d at 1149. Multiemployer welfare funds are not participants in collective bargaining agreement negotiations and typically have no knowledge of the nature of the original dealings between the union and the employer. Instead, they rely upon the accuracy of the terms of the collective bargaining agreements of all of their members in making the actuarial calculations that produce their contribution

and payout systems for all of their members.  See Robbins v. Lynch, 836 F.2d 330, 333 (7th Cir. 1988).

Indeed, even if a multiemployer welfare fund has some knowledge of the negotiating history leading up to the signing of a collective bargaining agreement, it is evident from section 515 and Congress's intent in passing it that the fund should still be able to rely on the language of the collective bargaining agreement as written and agreed to by both the union and the employer.  Congress sought to minimize the administrative costs of detecting and collecting delinquencies that "detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans" through the passage of section 515.  126 Cong. Rec. 23,039 (1980) (remarks of Rep. Thompson).  If multiemployer welfare funds were required to interpret the language in collective bargaining agreements based upon information they may have regarding the negotiations underlying the collective bargaining agreements, the chore of preparing their actuarial calculations would be highly burdensome and expensive, as well as risky; if the welfare fund misinterpreted the actual underlying intention of the parties and relied upon that misinterpretation in arriving at their actuarial calculation, all of the members of the multiemployer fund would suffer ultimately through the lower benefits and higher contributions which would result from trying to correct these errors.  By enacting section 515, Congress sought to eliminate such problems, leaving to employers and unions the simpler task of ensuring that the plain language of their collective bargaining agreements represents their intentions.

The courts of appeals which have had the opportunity to review section 515, including this court, have all regarded it as a limitation on the defenses available to an employer when sued by a welfare fund.  See, e.g., Agathos, 977 F.2d at 1505 (employer may not assert fraud in the inducement as a defense); Trustees of Laborers Local Union # 800 Health and Welfare Trust Fund v. Pump House, Inc., 821 F.2d 566, 568 (11th Cir. 1987) (per curiam) (same); Southwest Administrators, Inc. v. Rozay's Transfer, 791 F.2d 769, 775 (9th Cir. 1986) (same), cert. denied, 479 U.S. 1065 (1987); Gerber Truck, 870 F.2d at 1154 (employer may not assert oral agreement with union not to enforce terms of collective bargaining agreement as a defense);  Bituminous Coal Operators' Association, Inc. v. Connors, 867 F.2d 625, 632-36 (D.C. Cir. 1989) (employer may not assert mutual mistake of fact in entering the collective bargaining agreement as a defense).

The Welfare Fund in the instant matter relies upon these cases to support its argument that McCormick cannot avoid paying its delinquent payments by arguing "mutual mistake" or "scrivener's error."  In particular, the Welfare Fund relies upon Bituminous Coal.  There, a multiemployer pension plan sued a delinquent coal operator for contributions.  Bituminous Coal, 867 F.2d at 627-28.  The coal operator defended against the suit on the ground that both parties to the collective bargaining agreement had intended that the employer's contributions to the fund would stop once the plan became so over-funded that its contributions could no longer be deducted under federal income

tax laws.  Thus, the operator presented the defense of "unilateral" and "mutual mistake."  Id. at 628.  The D.C. Circuit ruled that, under section 515, such a defense is not allowed: "If it means nothing else, section 515 means that, at least when the Trustees [of the fund] are not implicated in the alleged misconduct, their suit cannot be thwarted by defenses not apparent from the face of the [Collective Bargaining] Agreement." Id. at 634.  The court found that the terms of the collective bargaining agreement at issue obligated the employer to make contributions to the fund beyond the point of full funding, and concluded that "[t]he requirement of section 515 that [the employer] make its contributions 'in accordance with the terms or conditions of such . . . agreement' thus precludes any defense that would avoid that obligation."  Id. at 636.

## A.

The district court considered the Welfare Fund's arguments and its reliance upon Bituminous Coal and the other cases interpreting section 515.  It concluded, however, that the facts of this case presented a "mutual mistake" that could be asserted as a defense.  Memorandum Opinion at 16. The court ultimately premised its conclusion that McCormick need not pay its delinquency on International Union v. Murata Erie North America, Inc., 980 F.2d 889 (3d Cir. 1992).  We will discuss this case in some detail.

The Murata case arose when a company terminated two company-run pension plans.  Because the pension plans were over-funded, nearly $7 million remained in the plans after annuities were purchased for all employees.  Id. at 897.  Both the company and the union representing the employees argued that they were entitled to recoup this excess, and the union ultimately sued the company to resolve this dispute.  This court was called upon to determine whether the company itself or the union representing the employees was entitled to the excess funds remaining in the pension plans following termination.  Id. at 893.

Under the laws in place at the time, the company could not recoup the excess unless the plan documents explicitly authorized it to do so.  Id. at 895.  The union argued that the plan documents did not contain any such provision; the company countered that the drafters had intended for the document to contain a provision allowing the company to recoup excess and that its absence was the result of a "scrivener's error," i.e. the mistake of a scrivener in drafting the document.

We initially noted that allowing for reformation of the document based on a scrivener's error is in some tension with the statutory purposes of ERISA:

> [O]ne statutory goal of ERISA is to insure that "every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan."  See Frank v. Colt Indus., Inc., 910 F.2d 90, 97 (3d Cir. 1990).  Allowing the doctrine of scrivener's error to apply in ERISA cases would seem at odds with this statutory purpose.  A plan document containing a scrivener's error might mislead an employee into believing he had rights or obligations

that he did not, in fact, have. Id. at 907.

We concluded, however, that under the facts of "this particular case," application of the scrivener's error doctrine was appropriate. Id. Specifically, we noted that the alleged error related to what was "admittedly a 'windfall' for either Murata or the [employees]," and thus the employees' "reasonable reliance on the . . . Plan documents would probably not have led them to believe that there would be any excess funds remaining." Id. "Nor is it likely," we continued, "that reading the plan documents would have led participants to believe that if any excess funds remained after termination, that excess would be distributed to them." Id. Thus, ERISA's statutory goal of insuring that employee's may rely upon the plan documents was not undermined by allowing reformation of the scrivener's error. Having determined that there was a genuine issue of material fact regarding whether or not there was such an error, we remanded the case for further proceedings. Id. at 907-08.

The district court in the instant matter relied upon our decision in Murata to conclude that reformation of the language in the Eligibility Clause of the 1988 Agreement to reflect the true agreement of the parties "would not frustrate the purpose of ERISA," noting that "[t]here is no evidence that any plan participant or beneficiary relied upon the Eligibility Clause in the 1988 Agreement to determine his or her benefits under the plan." Memorandum Opinion at 17.

We find the district court's reliance upon Murata misplaced. Murata did not involve a suit by a multiemployer fund, nor did it involve a claim for delinquent contributions. Rather, it concerned efforts by an employer to retain the excess funds remaining in the company's own terminated pension plan. Therefore, section 515 and the concern that led Congress to enact it -- namely that multiemployer plans must be able to rely on the plain language of collective bargaining agreements or plans in order to ensure that they have sufficient funds to pay out required benefits -- were not at issue. Instead, we were concerned only with ensuring that employees could reasonably rely upon the language of the plan. It was these employees with whom the agreement was made and who, through their union, presumably had some knowledge of the original intent of the parties.

In the instant case, however, it is not relevant to our inquiry whether the newly hired employees relied upon the Eligibility Clause. Neither the union nor any individual workers are parties to this lawsuit. Instead, the question is whether, under section 515, the multiemployer Welfare Fund, and in turn its members -- third-party beneficiaries who were not parties to the collective bargaining agreement -- should be able to reasonably rely upon the language in the collective bargaining agreement as written. Murata provides us no guidance in this area.

B.

Having concluded that Murata is inapposite to the question before us, we must assess whether under section 515 a mutual mistake made between the employer and the union in agreeing to

collective bargaining agreement language can be a defense to a delinquency action by a multiemployer welfare fund. While this court has never specifically endorsed the D.C. Circuit's decision in Bituminous Coal, which held that mutual mistake cannot be asserted as a defense, we have clearly endorsed the decisions of other courts of appeals in concluding that traditional contract defenses normally available against third party beneficiaries are not available against welfare funds. See Agathos, 977 F.2d at 1505-06 (citing with approval to Benson, 907 F.2d at 316; Rozay's Transfer, 791 F.2d at 775; Gerber Truck, 870 F.2d at 1154). In fact, we have explicitly held that there are only three recognized defenses which may be asserted by an employer as a means of avoiding contributions to an employee benefit plan as required under the terms of a collective bargaining agreement:

> (1) the pension contributions themselves are illegal . . . ; (2) the collective bargaining agreement is void ab initio, as where there is fraud in the execution, and not merely voidable, as in the case of fraudulent inducement . . . ; and (3) the employees have voted to decertify the union as its [sic] bargaining representative, thus prospectively voiding the union's collective bargaining agreement.

Agathos, 977 F.2d at 1505 (citations omitted); see also Connors v. Fawn Mining Corp., 30 F.3d 483, 490 (3d Cir. 1994). A "mutual mistake" between the union and the employer in drafting their collective bargaining agreement is not one of those recognized defenses, and we do not recognize it as such today.

McCormick argues, however, that we should affirm the district court's decision that mutual mistake may be asserted as a defense because the actions of the Welfare Fund itself were implicated in the mistake. In essence, McCormick urges that we carve out a fourth defense which may be asserted by employers seeking to defend against actions by welfare funds to collect delinquent payments, namely that the welfare fund itself was responsible for a mistake in the collective bargaining agreement.

It does appear that Bituminous Coal itself, the D.C. Circuit decision holding that mutual mistake may not be asserted as a defense, leaves room for the defense of mutual mistake in cases where the welfare fund has engaged in misconduct causing the mistake:

> When the trustees of a pension plan created pursuant to collective bargaining agreement sue an employer for contributions required by the plan, the employer may not defend on the ground of union misconduct in negotiating the agreement. If it means nothing else, section 515 means that, at least when the Trustees [of the fund] are not implicated in the alleged misconduct, their suit cannot be thwarted by defenses not apparent from the face of the Agreement.

Bituminous Coal, 867 F.2d at 634 (emphasis added).

Such a defense also does not appear to be inconsistent with Congress's concern in passing ERISA section 515, namely that "trustees of plans [be permitted] to recover delinquent contributions efficaciously, and without regard to issues which

might arise under labor-management relations laws," and that plans be able to meet funding obligations that are hindered by delinquent funds. 126 Cong. Rep. 23,039 (1980) (remarks of Rep. Thompson). If the Welfare Fund itself engaged in fraud or misconduct causing incorrect language to be injected into a collective bargaining agreement, it might be subject to the defense because it would no longer be in the role of a holder in due course. However, we make no such holding.

McCormick does not allege that the Welfare Fund committed fraud or engaged in misconduct. It merely makes sweeping statements in its brief before this court that "it is not disputed that it was the Welfare Fund's conduct which caused the mysterious modification of the eligibility terms" and that "the present delinquency action could have been avoided if the Fund had acted in a forthright manner," Appellee's Brief at 18. McCormick appears to place blame upon the Welfare Fund for simply providing the suggested language to the union when this language was different from the language of the previous two collective bargaining agreements. It suggests that if a Welfare Fund "contemplates changing established and previously negotiated terms in a collective bargaining agreement, the Welfare Fund has to notify the parties of the modification," Appellee's Brief at 19, and that its failure to do so should be viewed as misconduct which it, as the employer, can point to in defense of the delinquency claim.

We decline to consider as misconduct the failure on the part of a multiemployer welfare fund to notify employers of changes in the language it suggests for inclusion in the health and welfare benefit clauses of their collective bargaining agreements. First, the absence of any provision in ERISA mandating such notification suggests that Congress did not intend to require it. ERISA includes many provisions which require benefit funds or their administrators to notify participants and beneficiaries of particular facts or events. Given "ERISA's interlocking, interrelated, and interdependent remedial scheme, which is in turn part of a 'comprehensive and reticulated statute,'" "[t]he assumption of inadvertent omission is rendered especially suspect." Massachusetts Mut. Life Ins. Co. v. Russell, 473 U.S. 134, 146 (1985) (citing Nachman Corp. v. Pension Benefit Guaranty Corporation, 446 U.S. 359, 361 (1980)). If Congress considered such notification necessary, we think it would have included a provision requiring it.

Second, such a notification requirement would impose an undue burden on multiemployer welfare funds, hindering their effective operation. Multiemployer welfare funds would be required to review the collective bargaining agreements of each of their members individually prior to sending out new suggested language, as well as to keep up with all of their other notification requirements and administrative obligations. This seems an unduly harsh burden when it is not mandated by the statute, and more importantly, when its purported aim -- ensuring that plan participants are aware of their rights and obligations under the terms of their collective bargaining agreements -- can be more easily and efficiently met if the employer simply reads

the language of the collective bargaining agreement prior to signing it.

We thus conclude that a multiemployer welfare fund has not engaged in any misconduct in failing to notify employers when language it suggests for inclusion in new collective bargaining agreements differs from language used in the employers' past collective bargaining agreements. Indeed, there is no evidence and there is no allegation that the Welfare Fund in the instant matter surreptitiously included its suggested language in the collective bargaining agreement unbeknownst to either party. Rather, it submitted its suggested language to the union, and when the language appeared unchanged in the collective bargaining agreement that was ultimately signed -- and presumably read and approved -- by both the employer and the union, the Fund relied upon it, as it was entitled to do under section 515.

IV.

McCormick urges this court to affirm the district court's opinion on various other grounds as well. Although we may affirm a correct decision of the district court on grounds other than those relied upon by the district court, see University of Maryland v. Peat Marwick Main & Co., 923 F.2d 265, 275 (3d Cir. 1991) (citing PAAC v. Rizzo, 502 F.2d 306, 308 n.1 (3d Cir. 1974)), we decline to do so here for the reasons that follow.

A.

McCormick first urges this court to affirm the district court on the theory that the 1988 Agreement was the result of fraud in the execution and is thus void. As noted above, this court has recognized that fraud in the execution of a collective bargaining agreement may serve as one of the three possible defenses against a delinquency action by a welfare fund. SeeFawn Mining, 30 F.3d at 490; Agathos, 977 F.2d at 1505. "'[F]raud in the execution' arises when a party executes an agreement 'with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms.'" Fawn Mining, 30 F.3d at 490 (quoting Rozay's Transfer, 791 F.2d at 774 (other citations and internal quotation marks omitted)).

In our recent decision in Fawn Mining we found that fraud in the execution was available as a defense because the union affirmatively led Fawn Mining to believe that the collective bargaining agreement it was signing would not require it to contribute to a pension fund and Fawn Mining had no opportunity to determine otherwise:

> Fawn Mining's defense is equivalent to a claim of "excusable ignorance of the contents of the writing signed."
>
> *   *   *
>
> If an employer reviews a document reflecting the agreements reached in collective bargaining and the union surreptitiously substitutes a materially different contract document before both sides execute it, we think it clear that there has been a fraud in the execution of the contract and that the agreement

> reflected in the executed document is void ab initio
> and unenforceable by the union. The employer has never
> manifested an assent to the terms of the alleged
> contract, and the written document purporting to
> evidence the agreement has been obtained by fraud.

Fawn Mining, 30 F.3d at 492-93 (emphasis added).

Fawn Mining makes clear that McCormick cannot assert fraud in the execution as a defense here because the undisputed facts indicate that Webb had several opportunities to review the language of the agreement prior to its execution. Specifically, the record reflects that Webb had the opportunity to review the language in the Eligibility Clause twice. First, Greenawalt provided him with the suggested language during the negotiations. Then, following the negotiations but before the formal execution of the agreement, Greenawalt supplied Webb with a complete draft of the 1988 Agreement instructing Webb to "review it and get back to [him] with any additions or corrections." Had Webb reviewed the agreement, he would have found the alleged error in the document and this entire dispute could have been averted. There is thus no evidence of any fraud or indication that Webb executed the Agreement "'"with neither knowledge nor reasonable opportunity to obtain knowledge of its character or its essential terms."'" Fawn Mining, 30 F.3d at 490 (quoting Rozay's Transfer, 791 F.2d at 774 (quoting U.C.C. 3-305(2)(c))) (other citations omitted). Accordingly, McCormick may not assert fraud in the execution as a defense.

### B.

McCormick further argues on appeal that the Welfare Fund inexcusably delayed in bringing the instant action until 1993 because it knew in August 1989 that McCormick was making contributions to the fund in accordance with the eligibility clause language from the 1983 and 1985 Agreements, and that accordingly, the Welfare Fund is precluded from recovering the delinquent funds under the doctrines of laches and waiver. We reject both contentions.

### 1.

The doctrine of laches consists of two essential elements: (1) inexcusable delay in instituting suit; and (2) prejudice resulting to the defendant from such delay. See University of Pittsburgh v. Champion Products, Inc., 686 F.2d 1040, 1044 (3d Cir.), cert. denied, 459 U.S. 1087 (1982). We conclude that it does not apply here. Within 19 months of its audit revealing the delinquency, the Fund formally began its efforts to collect the delinquency, and it filed suit in federal district court on April 22, 1993, less than two years after the audit and well within the three year statute of limitations for bringing this type of action. See Vernau v. Vic's Market, Inc., 896 F.2d 43, 45 (3d Cir. 1990). There is no evidence that this delay was dilatory.

Furthermore, there is no evidence that McCormick was in any way prejudiced by this reasonable delay. McCormick alleges it has been prejudiced because the amount it owes would have been smaller than that now claimed and that McCormick would not be facing liquidated damages, penalties and attorneys' fees. In essence, McCormick asks this court to assume that it would have

behaved differently and actually paid the delinquent amount if it had known that suit would be filed. We have no basis for accepting this claim and we decline to do so.

2.

McCormick further claims that the Welfare Fund has waived its opportunity to seek recovery of the delinquent funds because it failed to respond to McCormick's notification that it intended to follow the terms of the eligibility clause of the 1983 and 1985 Agreements instead of the clause in the 1988 Agreement.

This court has explained that waiver is the "intentional relinquishment of a known right." Paradise Hotel Corp. v. Bank of Nova Scotia, 842 F.2d 47, 51 (3d Cir. 1988). The Supreme Court has held that in order to find waiver of a statutory right, "the waiver must be clear and unmistakable." Metropolitan Edison Co. v. NLRB, 460 U.S. 693, 708 (1983). There is no evidence in the record of any waiver, let alone a "clear and unmistakable one," and accordingly the doctrine of waiver does not apply here.

C.

McCormick further urges that we affirm the district court on the ground that the Welfare Fund would be unjustly enriched if it were to prevail on its claim. In essence, McCormick claims that, because there is no evidence that the Fund provided coverage for any new employees for whom McCormick did not pay benefits until they met the 45-day eligibility language under the 1983/1985 Agreements, the Fund should not receive the delinquent funds. However, a welfare fund is not unjustly enriched simply because it has received benefit payments on behalf of particular employees who have not made claims, because they presumably would have received coverage had they submitted claims. A benefit payment is made for coverage in case a claim is submitted. As such, a lack of actual claims is irrelevant. Furthermore, the welfare fund expected to have those funds at hand for payout of benefits on behalf of other employees, including employees of other employers who are members of the multiemployer Welfare Fund.

D.

Finally, McCormick urges that, should we decide, as we do, to reverse the order of the district court in favor of McCormick, we not reverse the judgment in favor of Webb. We note that the district court did not specifically address this issue.

This court has held that there is no indication that Congress intended to hold corporate officers liable for a corporation's failure to contribute to benefit funds when there is no basis for piercing the corporate veil. See Solomon v. Klein, 770 F.2d 351, 353 (3d Cir. 1985). Appellants made no allegations in their complaint that the corporate veil should be pierced, but apparently sought judgment against Webb only on the basis of his position as a corporate officer. Accordingly, we will dismiss the claim against Webb.

V.

For the foregoing reasons we reverse the decision of the district court granting summary judgment in favor of defendants and denying plaintiffs' cross-motion for summary judgment; issue

summary judgment in favor of plaintiffs; and dismiss the claim against James Webb.

CENTRAL PENNSYLVANIA TEAMSTERS
v.
McCORMICK DRAY LINE, INC.
No. 95-1740

ALDISERT, Circuit Judge, Dissenting

Until this case came along, I thought that this court was bound by our careful and important opinion holding that the equitable doctrine of contract reformation due to a scrivener's error is consistent with the purposes of ERISA.  See International Union v. Murata Erie North America, 980 F.2d 889, 907 (3d Cir. 1992).  Four years later, the majority gut that decision.

In so doing, the majority embrace arguments from the Pennsylvania Teamsters Health and Welfare Fund that torture the canons of good reason and assault the cardinal axiom of ERISA that the rights and obligations of health and welfare funds stand or fall on what parties agree to in a collective bargaining agreement.

Before us, the Fund argues form over substance and trumpets that it has been prejudiced, even though it has not paid out one penny in accordance with the erroneous written language.  Before us, the Fund asserts that theoretical concepts of reliance inhere in the language of the agreement, when in fact the collective bargaining history of the parties since 1983 unquestionably reveals that both the parties to the labor agreement and the Fund have operated on the basis of the intended formula, which the parties have since restored.  The Fund's claim of reliance therefore amounts to an argument aptly described, in the words of the Immortal Bard, as "full and sound and fury and signifying nothing."

I.

The facts in this case are simple and undisputed.  McCormick Dray is a trucking company that employs union drivers represented by Teamsters Local 764.  McCormick Dray and the Local negotiated a series of collective bargaining agreements.  Each of these agreements included a provision that McCormick would pay premiums to the Appellant Fund for the purpose of providing medical benefits to the drivers and their families.  Pursuant to these agreements, the employees would become eligible for benefits after they worked a specified period of time at McCormick.  Prior to 1983, that specified period of time was 30 days.

In 1983, due to the spiraling cost of premiums and the fact that many McCormick employees left after 30 calendar days but before 60 calendar days, McCormick and the Local negotiated a change in the eligibility clause from 30 to 45 days.  The Health and Welfare Fund approved the new language.  Both McCormick Dray and the Local believed that this eligibility clause was controlling unless subject to further negotiations.  Indeed, the next agreement, in 1985, repeated the 45-day eligibility

language, as did the 1991 agreement.

Several months before the expiration of the 1985 agreement, however, McCormick and the Local began to negotiate terms for the 1988 agreement. The eligibility clause was never discussed in these negotiations, nor was any change in the clause contemplated by the parties. A contract offer was prepared by McCormick and submitted to the Local, which approved. Thereafter, during the Local's preparation of the final agreement, the 45-day eligibility language was replaced with language providing for coverage "as of the first day of the month immediately following [an employee's] employment." JA 202-03.

Notwithstanding this change in the eligibility period, both parties assumed that the eligibility clause had remained intact; McCormick continued to make contributions to the Fund on behalf of newly hired employees under the conventional 45-day eligibility requirement, and the Fund made no payments in accordance with the erroneous language.

In August of 1989, the company discovered the error and advised the Local and new employees hired thereafter. Principals of the Local were as surprised as McCormick that the eligibility period in the agreement was not 45 days; indeed, in 1993, the Local and McCormick agreed in writing that the 1988 language did not reflect either parties' intent. When the 1988 agreement came up for renewal in 1991, the 45-day eligibility requirement again was included, and without negotiation. Thus, the clause under consideration was contained in the original labor agreements of 1983, 1985 and 1991, and, according to a written agreement, was "inadvertently misstated" in the 1988 agreement. These are more than historical facts; this sequence looms large in the subsequent discussion of reliance by the Fund.

The Fund conducted an audit in 1991 and did not attempt to recoup any alleged deficiency until 1993. The filing of its complaint followed on the heels of two developments: McCormick withdrew from the Fund in 1992 when the premium jumped from $277 a month to approximately $400; and the Local requested action by the Fund as a method of putting pressure on McCormick to resolve an unrelated labor dispute.

II.

Under the doctrine of scrivener's error, a clerical mistake made in drafting a document may be reformed on the basis of parol evidence, provided that the evidence of the mistake is "clear, precise, convincing and of the most satisfactory character" and that the mistake does not reflect the intent of the parties. SeeIn re Estate of Duncan, 426 Pa. 283 (1967); see also Easton v. Washington County Ins. Co., 391 Pa. 28 (1957). Here, there is no dispute between the signatories that a mistake has occurred, and the collective bargaining agreement clearly does not reflect the parties' intent.

We must then inquire whether importing the equitable doctrine of reformation of contract due to a scrivener's error is available to McCormick here, in an action brought under ERISA by a third party beneficiary to a collective bargaining agreement. To be sure, Section 515 of ERISA requires an employer to

contribute to a multiemployer benefit plan in accordance with the "terms and conditions" set forth in the collective bargaining agreement. 29 U.S.C. 1145. And there is no dispute that, literally construed, the terms and conditions of the 1988 agreement make eligible any employee "as of the first day of the month immediately following his employment." JA 202-03. Yet applying rules with unfailing technical accuracy is not the aggregate of our responsibility. As Judge Cudahy eloquently stated in Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Services, Inc., 870 F.2d 1148, 1158 (7th Cir. 1989) (Cudahy, J., dissenting), "all rules must admit of equitable exception and modification in appropriate cases lest the tyranny of theory over reality bring about obnoxious results." And indeed, we have recognized several exceptions to ERISA's mandate that contract defenses traditionally available against third party beneficiaries are not available against welfare funds. See Agathos v. Starlite Motel, 977 F.2d 1500, 1505-06 (3d Cir. 1992) (recognizing three exceptions to this general rule).

This was the philosophy that undergirded our Muratadecision, in which Judge Becker, writing for the court, acknowledged that a scrivener's error exception "would seem at odds with [the statutory purpose of] insur[ing] that 'every employee may, on examining the plan documents, determine exactly what his rights and obligations are under the plan.' Murata, 980 F.2d at 907 (citing Frank v. Colt Indus., Inc., 910 F.2d 90, 97 (3d Cir. 1990)). Even so, we decided to cast our die on the side of an equitable exception. Thus there is nothing in our jurisprudence governing labor relations or ERISA, as expressed by Agathos and Murata, that endorses the majority's "tyranny of theory over reality" in bringing about results that are obnoxious to parties of a labor agreement. The precise inquiry that remains, then, is whether the facts in this case should persuade us to eviscerate the central teachings of Murata.

### III.

The majority dismiss the Murata holding because that case "did not involve a suit by a multiemployer fund, nor did it involve a claim for delinquent contributions." Opinion at 16. Neither of these distinctions is tenable.

The reason for disallowing the scrivener's error exception in a multiemployer context, say the majority, is that "multiemployer plans must be able to rely on the plain language of collective bargaining agreements or plans in order to ensure that they have sufficient funds to pay out required benefits." Opinion at 16. The majority's reluctance stems from a multiemployer plan's concept of multiple fiduciaries with control over a common fund: to allow one employer to bind a fund to pay benefits outside the strict terms of a plan would force all the employers to pay for one employer's reformation, and insofar as such payments damage the actuarial soundness of the plan, they burden the employees of many other corporations as well.

Whatever may be the legitimacy of this reasoning in the abstract, it is not relevant to the undisputed facts here.

Neither other companies in the multiemployer consortium nor the Fund itself were forced to expend one cent, directly or indirectly, on the basis of the 1988 contract reformation.  Thus, the basis of the concept in theory had no adverse effect in reality.  The reason asserted for artificially engrafting an multiemployer exception to the teachings of Murata is simply not warranted here.  The double maxim says it all: cessante ratione, cessat ipsa lex, the rule follows where its reason leads; where the reason stops, there stops the rule.

The Fund neither collected premiums from McCormick nor provided compensation to employees based on a scrivener's error now subject to equitable reformation.  Indeed, McCormick contributed to the Fund consistent with the conventional 45-day eligibility, and the Fund made only corresponding outlays to employees.  Thus the Fund here could not possibly demonstrate reliance -- whether a kind of de jure actuarial reliance, or a de facto we-paid-out-benefits-in-reliance-on-the-error.  Logicians refer to such an argument as the fallacy of irrelevant conclusion, or ignoratio elenchi.

IV.

The majority's additional reason for not following Murata is that we accepted the doctrine of scrivener's error in that case because what was at stake was a "windfall."  The majority argue that, because the Fund will entertain claims brought by any McCormick employee who was eligible for benefits under the erroneous eligibility clause, no "windfall" is at stake here.  This argument flies in the face of basic economic reality.

I reiterate that the Fund has not made any payments in accordance with the erroneous language.  Surely, with the benefit of more than six years of hindsight, the Fund is now fully aware of any potential claims; it can thus calculate effortlessly whether the company's additional contributions would exceed the Fund's additional payouts to the employees.  Indeed, the filing of this action surely indicates that the simple math has been computed.  There have been no payouts whatsoever.  Therefore, when, without reliance on the error in the agreement, the Fund seeks to recover additional contributions from McCormick, that's a windfall.

V.

The Fund never relied on the scrivener's error, nor does it deserve a windfall.  Moreover, in Murata we resolved the fundamental tension between recognizing an exception for scrivener's error and satisfying the purposes of ERISA.  The circumstances presented here provide no reason for decimating a well-reasoned decision of this court.

Accordingly, I would affirm the judgment of the district court.  I dissent.