**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

BAKERY AND CONFECTIONERY
UNION AND INDUSTRY INTERNATIONAL
PENSION FUND; BOARD OF
TRUSTEES OF THE BAKERY AND
CONFECTIONERY UNION AND INDUSTRY

INTERNATIONAL PENSION FUND,
<u>Plaintiffs-Appellants,</u>

v.

RALPH'S GROCERY COMPANY,
<u>Defendant-Appellee.</u>

No. 96-1095

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Alexander Williams, Jr., District Judge.
(CA-94-2630-AW)

Argued: April 11, 1997

Decided: July 9, 1997

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Reversed and remanded by published opinion. Senior Judge Butzner
wrote the opinion, in which Judge Murnaghan and Senior Judge Phil-
lips joined.

_____

**COUNSEL**

**ARGUED:** Julia Penny Clark, BREDHOFF & KAISER, P.L.L.C.,
Washington, D.C., for Appellants. William B. Irvin, Sr.,

MCLAUGHLIN & IRVIN, Los Angeles, California, for Appellee.
**ON BRIEF:** Alice O'Brien, BREDHOFF & KAISER, P.L.L.C.,
Washington, D.C., for Appellants. Kenneth W. Irvin, MORRISON &
FOERSTER, Washington, D.C., for Appellee.

_____

**OPINION**

BUTZNER, Senior Circuit Judge:

The Confectionery Union and Industry International Pension Fund
(Fund) and its trustees filed this suit pursuant to section 515 of the
Employee Retirement Income Security Act of 1974 (ERISA), 29
U.S.C. § 1145, to recover delinquent pension fund contributions from
Ralph's Grocery Company (Company). The central issue in this case
is whether the plan documents and the Company's collective bargain-
ing agreement with the local union require it to make pension contri-
butions to the Fund based on severance pay received by the
Company's employees. The district court concluded that the Com-
pany was not required to make contributions for severance pay and
entered summary judgment for the Company. We reverse and remand
with instructions to enter judgment in favor of the Fund.

When the facts are undisputed, summary judgment is appropriate
only if one party is entitled to judgment as a matter of law. Fed. R.
Civ. P. 56(c). We review the entry of summary judgment de novo,
applying the same standard as the district court. Stone v. Liberty
Mutual Ins. Co., 105 F.3d 188, 190-91 (4th Cir. 1997). When review-
ing cross-motions for summary judgment, we may, if appropriate,
direct entry of judgment in favor of the party whose motion was
denied by the district court. Monahan v. County of Chesterfield, 95
F.3d 1263, 1265 (4th Cir. 1996).

I

Section 515 of ERISA, 29 U.S.C. § 1145, states:

Every employer who is obligated to make contributions to
a multiemployer plan under the terms of the plan or under

2

the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

Section 515 "creates a federal right of action independent of the contract on which the duty to contribute is based." Bituminous Coal Operators' Ass'n, Inc. v. Connors, 867 F.2d 625, 633 (D.C. Cir. 1989).

In a collection action based on section 515, a multiemployer plan can enforce, as written, the contribution requirements found in the controlling documents. Central Pennsylvania Teamsters Pension Fund v. McCormick Dray Line, Inc., 85 F.3d 1098, 1103 (3d Cir. 1996). In this respect, section 515 puts multiemployer plans in a stronger position than they otherwise occupy under common law contract principles. See, e.g., Central States, Southeast and Southwest Areas Pension Fund v. Independent Fruit and Produce Co., 919 F.2d 1343, 1348 (8th Cir. 1990); Conners, 867 F.2d at 633-34. Because an employer's obligation to a multiemployer plan usually arises through a collective bargaining agreement negotiated and agreed to by the employer and union, the multiemployer plan is, under common law contract principles, a third party beneficiary of the collective bargaining agreement. See Sinai Hospital of Baltimore, Inc. v. National Benefit Fund for Hospital & Health Care Employees, 697 F.2d 562, 568 (4th Cir. 1982). Although a third party beneficiary can enforce the terms of a contract that inure to its benefit, it is subject to defenses that the promisor could assert against the original party to the contract. Connors, 867 F.2d at 632. This often meant a multiemployer plan would be subject to defenses the employer could assert against the local union. Independent Fruit and Produce , 919 F.2d at 1348; but see Lewis v. Benedict Coal Corp., 361 U.S. 459 (1960) (recognizing, before the enactment of section 515, an exception to the common law third party beneficiary rule in the context of multiemployer funds).

Before section 515 was enacted, collection actions by multiemployer plans often were complicated by issues that had arisen between the employer and the local union but were unrelated to the employer's obligation to the plan. Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck Service, Inc., 870 F.2d 1148, 1152-53

3

(7th Cir. 1989); Independent Fruit and Produce, 919 F.2d at 1348. Injecting these tangential issues into collection actions consumed plan resources by increasing the cost and delay involved in litigation. See, e.g., Independent Fruit and Produce, 919 F.2d at 1348. And, in cases in which the employer's defense was successful, the plan was left without contributions it had been promised and had expected. See, e.g., id. Ultimately, these losses were shouldered by employee beneficiaries through reduced benefits and other employers through increased contributions. Id.; Gerber Truck Service, 870 F.2d 1151; Benson v. Brower's Moving & Storage, Inc., 907 F.2d 310, 314 (2d Cir. 1990). Because multiemployer plans typically involve many employers and unions across the nation, in most cases it would be difficult and costly for such plans to monitor the problems or understandings that arise between the individual unions and employers. McCormick Dray Line, 85 F.3d at 1103; Gerber Truck Service, 870 F.2d at 1151.

Section 515 strengthens the position of multiemployer plans by holding employers and unions to the literal terms of their written commitments. Because an employer's obligation to a multiemployer fund is determined by the plain meaning of the language used in the collective bargaining agreement, the actual intent of the contracting parties (i.e., the employer and the local union) is immaterial when the meaning of that language is clear. Independent Fruit and Produce, 919 F.2d at 1349, 1352-53; see also Connors, 867 F.2d at 635-36. Consequently, an employer is not permitted to raise defenses that attempt to show that the union and the employer agreed to terms different from those set forth in the agreement. See, e.g., Gerber Truck Service, 870 F.2d 1148 (refusing to enforce an oral agreement between employer and union). Nor is an employer permitted to raise defenses that relate to claims the employer may have against the union. See, e.g., Agathos v. Starlite Motel, 977 F.2d 1500, 1505 (3d Cir. 1992) (fraud in the inducement); Connors, 867 F.2d at 632-36 (mistake of fact). By allowing multiemployer funds to enforce the literal terms of an employer's commitment, section 515 increases the reliability of their income streams, reduces the cost and delay associated with collection actions, and reduces or eliminates the cost of monitoring the formation of collective bargaining agreements. Nevertheless, multiemployer funds are not permitted to "enforce a nonexistent contractual obligation." Teamsters Industrial Employees Welfare

4

Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d 132, 138 (3d Cir. 1993).

II

The Fund is a multiemployer defined benefit pension plan, which was created in 1955 to provide retirement benefits for employees working in the baking and candy industries. The Fund was formed through an Agreement and Declaration of Trust (trust) and is administered by a board of trustees, which is composed of an equal number of employer and union representatives. Pension benefits are funded by participating employers through periodic contributions. Currently, 1,100 employers with over 60,000 employees participate in the Fund, and the Fund pays benefits to over 40,000 retired employees.

The Company is a member of the Food Employers Council, Inc. (Council), which was formed by the grocery supermarket industry in Southern California. The Council is a labor relations association that negotiates and administers industry-wide collective bargaining agreements with unions representing employees of the Council's members.

The Company has participated continuously in the Fund since 1957. Its commitment to the Fund has been set forth in the collective bargaining agreements that it has negotiated through the Council. In 1992, the Company and the Bakery, Confectionery, and Tobacco Workers International Union, Local No. 37 (Union) entered into a three-year collective bargaining agreement, which consists of 35 sections and the standard clause. The Union represents the employees at one of the Company's plants. The Company and the Union were parties to similar collective bargaining agreements during past years.

The collective bargaining agreement includes a provision that entitles the Company's employees to severance pay under specified circumstances. The severance pay provision, section XV, states:

> [T]he Employer shall not be required to make Benefit Fund, Pension or any other contributions of any nature on any Severance Pay paid pursuant to the provisions of this SECTION.

5

Section XXVI of the collective bargaining agreement provides that the Company shall make contributions to the Fund of an agreed amount. This section of the bargaining agreement makes reference to an agreement supplement that sets forth "the terms and conditions of section XXVI in more detail." This supplement is the Standard Collective Bargaining Clause, which the Union and the Company executed as a part of their collective bargaining agreement. The Fund requires every participating employer and union, as a condition on participation in the Fund, to include the standard clause in their collective bargaining agreement. The standard clause establishes each employer's required rate of contribution. Subsequently, the parties executed superseding standard clauses that adjusted the Company's contribution rate for 1994 and 1995.

The standard clause contains the following provisions:

> a. The Employer hereby agrees to be bound as a party by all the terms and provisions of the Agreement and Declaration of Trust dated September 11, 1955, as amended, establishing the Bakery and Confectionery Union and Industry International Pension Fund (hereinafter called the Fund) and said Agreement is made part hereof by reference.
>
> * * *
>
> g. This clause encompasses the sole and total agreement between the Employer and the Union with respect to pensions or retirement.

After the Company and the Union executed the collective bargaining agreement, including the standard clause, they forwarded a copy to the Fund. The agreement was reviewed by one of the Fund's clerical employees, who completed a contract analysis form, which indicates, among other things, that the employee checked the severance pay provision and noted that the standard clause had been completed. On the basis of this review, the Fund, by letter, approved the Company's continued participation in the Fund.

6

In 1971, by formal resolution, the trustees declared that participating employers were required to make contributions based on severance pay. The Fund has communicated this policy to participating employers on several occasions. In 1982 and twice in 1985, the Fund sent notices of the policy to the Company's payroll department. In addition, the remittance form that the Fund has provided to employers from 1975 through 1993 states that contributions are required for severance pay. The Company's payroll department completed the form each month and sent it to the Fund along with the monthly contribution.

In the fall of 1992, the Company began to reduce the workforce covered by the collective bargaining agreement, and, in 1993, it began disbursing severance pay to approximately 200 employees. This was the first time the Company had awarded severance pay. It did not make pension contributions based on those payments. When the Fund discovered this, it informed the Company that contributions are required for severance pay, and it demanded the delinquent contributions. When the Company refused to pay, the Fund filed this lawsuit.

Following discovery, the parties stipulated the facts and filed cross-motions for summary judgment. In its motion, the Company took the position that it is not required to make contributions for severance pay because the main agreement expressly excludes such an obligation. On the other side, the Fund argued that the extent of the Company's obligation is controlled by section 515 of ERISA and the standard clause, which it contends requires contributions based on severance pay.

The district court granted the Company's motion for summary judgment. See Bakery and Confectionery Union and Industry International Pension Fund v. Ralph's Grocery Co., Civil No. AW-94-2630 (D. Md. Dec. 12, 1995) (unpublished). The court decided that the entire collective bargaining agreement, rather than only the standard clause, determines the extent of the Company's obligation to the Fund. The court pointed out that section XV expressly excludes severance pay contributions while the standard clause does not specifically refer to severance pay. The district court also ruled that the Fund's 1971 severance pay resolution does not affect the Company's

obligation because the resolution is ineffective. In the court's view, the resolution exceeded the trustees' authority to amend the trust.

III

According to section 515, the scope of the Company's obligation to the Fund is controlled by the plan documents and the representations that appear in the collective bargaining agreement. Interpreting those documents in accordance with the principles embodied in section 515, we hold that the Company is required to make contributions based on severance pay.

The first question we examine is whether the Company's obligation to the Fund is limited by section XV's severance pay provision. According to the trust, each participating employer's collective bargaining agreement with the union determines that employer's rate of contribution to the Fund. However, in order to be approved for participation in the Fund, the collective bargaining agreement must specify the contribution rate that corresponds to the benefit package promised to that employer's workers. Those contribution rates are set by the Fund.

The collective bargaining agreement in this case includes both section XV and the standard clause. Although section XV purports to exclude contributions based on severance pay, the standard clause renders section XV's exclusion ineffective against the Fund. The standard clause states that "[t]his clause encompasses the sole and total agreement between the Employer and the Union with respect to pensions or retirements." By agreeing to this language, the Company unambiguously represented that it had not agreed with the Union on any other terms relating to pensions. By virtue of section 515, the Fund is permitted to rely on and enforce the literal meaning of the Company's representation. In other words, the Fund was entitled to assume that, as promised, the standard clause was the parties' complete agreement on pensions. The Fund was not required to comb through the other parts of the collective bargaining agreement searching for additional terms related to pensions. See Central Pennsylvania Teamsters Pension Fund v. W & L Sales, Inc., 778 F. Supp. 820, 830 (E.D. Pa. 1991). Instead, because the Fund was permitted to rely on the standard clause's representation of completeness, additional pen-

8

sion terms set forth outside the standard clause do not alter the Company's obligation to the Fund.

The primacy of the standard clause also finds support in the trust to which the Company agreed. The trust authorizes the trustees to require employers, as a condition on participation in the Fund, to execute any written instruments the trustees prescribe. It is pursuant to this authority that the trustees require employers and unions to enter into the standard clause. According to the trust, the Fund's acceptance of an employer is based on the terms of the prescribed instruments. Therefore, the terms of the standard clause form the basis for the Company's relationship with the Fund.

Furthermore, allowing the Fund to rely on the "sole and total agreement" language of the standard clause is consistent with the congressional policies embodied in section 515. As noted in the previous section, multiemployer funds typically serve many employers and unions nationwide. One purpose of section 515 is to reduce the cost of administering these funds. Gerber Truck Service, 870 F.2d at 1154. Other courts have recognized that such costs are minimized when a fund implements uniform rules applicable to all employers. W & L Sales, 778 F. Supp. at 830; Gainey v. Vemo, 627 F. Supp. 408, 411 (W.D. Wash. 1986).

The Fund uses the standard clause to achieve a uniform standard of participation for all participating employers. By means of the standard clause, the Fund requires every employer to agree to make contributions at the specified rate, to be bound by the trust's terms and conditions, and not to enter into any additional agreements with the union regarding pensions. By promising that the parties have not agreed to additional terms regarding pensions, the employer relieves the Fund of the need to search the rest of the agreement for additional pension terms. This arrangement reduces the cost of administering the Fund in two ways. First, the Fund need not retain counsel to inspect every provision of every collective bargaining agreement it handles. Second, the Fund does not bear the risk of losing contributions due to overlooked or misinterpreted provisions that appear outside the standard clause and purport to alter the uniform standard of participation.

9

IV

The Company argues that the severance pay exclusion is not trumped by the standard clause. In its view, the integration language, which purports to make the standard clause the parties' exclusive agreement on pensions, should not be given effect. The Company points out that inclusion of an integration clause in a writing does not, by itself, establish that the writing is, in fact, the parties' entire agreement. According to the Company, the evidence in this case establishes that the contracting parties, the Union and itself, did not intend the standard clause to be their exclusive agreement on pensions. The strongest evidence the Company can offer in this regard is the severance pay provision itself. If the parties intended the standard clause to be their exclusive agreement on pensions, the Company argues, they would not have bothered to negotiate and agree to an additional term involving pension contributions. Because the contracting parties did not intend to make the standard clause their complete agreement, the Company contends that the integration clause is ineffective.

This argument misses the point. It is generally true that, although the inclusion of an integration clause "suggests that the agreement is fully integrated, it does not by itself dictate that conclusion." Bowden v. United States, 106 F.3d 433, 440 (D.C. Cir. 1997). And, it is also generally true that "a writing cannot of itself prove its own completeness, and wide latitude must be allowed for inquiry into circumstances bearing on the intention of the parties." Restatement (Second) of Contracts § 210 cmt. b (1981). Traditional rules of contract construction, however, apply to collective bargaining agreements only when they do not conflict with federal labor law. See Rolls-Royce Motor Cars, 989 F.2d at 135. In the specific context of a multiemployer suit for delinquent contributions, the traditional rules regarding integration clauses conflict with section 515. See Connors, 867 F.2d at 635-36. According to section 515, the literal terms of the agreement control the employer's obligation to the Fund. The actual intent of the contracting parties is immaterial when it differs from the ordinary meaning of the language used in the writing. Independent Fruit and Produce, 919 F.2d at 1349, 1352-53. By reason of section 515, the Company and the Union are bound by the statement that says that the standard clause is the "sole and total agreement" on pensions or retirement.

10

V

The Company also argues that section 515 requires us to enforce the severance pay provision of section XV as written. The difficulty with this argument is that it ignores the unavoidable conflict between the severance pay provision and the standard clause's integration language. If the severance pay provision is given effect and considered to be part of the parties' agreement on pensions, the integration language in the standard clause becomes meaningless. On the other hand, if the standard clause is taken to be the parties' complete agreement on pensions, then the severance pay provision is left out.

When two conflicting provisions of a collective bargaining agreement cannot be harmonized, the court must decide which provision should be given effect. See Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co., 753 F.2d 1512, 1518 (9th Cir. 1985). In this case, section 515 makes the choice clear. The purpose of section 515 is to permit multiemployer funds to rely on the representations made to it. Section 515 allows the Fund to impose uniform participation requirements and to rely on the representation agreed to by the Company and the Union in the standard clause.

VI

The question that arises next is whether the standard clause requires the Company to make contributions based on severance pay. We conclude that it does.

By agreeing to the 1993 standard clause, the Company promised to contribute $2.083 to the Fund "[f]or each hour . . . for which an employee, subject to the Collective Bargaining Agreement, receives pay." By its plain meaning, this phrase requires the Company to make a contribution for each hour of pay received by an employee. Its application is not limited to a certain kind of pay, and there is no doubt that severance pay is a type of pay. Cf. Nolde Brothers, Inc. v. Bakery & Confectionery Workers Local 358, 430 U.S. 243, 248-49 n.4 (1977) (noting that severance pay is a form of deferred compensation). The Company awards severance pay on an hourly basis (with a maximum limit of 900 hours). Therefore, the standard clause obli-

11

gates the Company to make a pension fund contribution for each hour for which an employee receives severance pay. Cf. Bakery & Confectionery Union v. United Baking Co., 495 F. Supp. 170 (W.D. Pa. 1980) (interpreting a similar provision--"for each day or portion thereof on which an employee subject to the collective bargaining agreement receives pay"--to require severance pay contributions); Bakery & Confectionery Union and Industry International Pension Fund v. Stroehmann Brothers Co., No. HM82-3259 (D. Md. Jul. 18, 1984) (unpublished) (interpreting a standard clause similar to the one in this case--"for each hour . . . for which an employee, subject to the Collective Bargaining Agreement, receives pay"--to require severance pay contributions).

This straightforward interpretation of the standard clause's contribution requirement is supported by the Fund's consistent and long-standing severance pay policy. Through the standard clause, the Company agreed to be bound by the rules of the trust. The trust provides that the employers are bound by the trustees' actions taken pursuant to the trust. Adopting the severance pay resolution was such an action. As a result, it obligates the employers, including the Company, to make severance pay contributions.

VII

The Company resists our interpretation of the standard clause. The standard clause provides:

> [T]he Employer agrees to make payments to the Bakery and Confectionery Union and Industry International Pension Fund for each employee working in job classifications covered by the said Collective Bargaining Agreement as follows:
>
>    * * *
>
> For each _hour_ or portion thereof, for which an employee, subject to the Collective Bargaining Agreement, receives pay, the Employer shall make a contribution . . . (emphasis in original).

12

The Company directs our attention to the qualifying phrase "subject to the Collective Bargaining Agreement." In its view, that phrase makes the Company's obligation subject to any additional terms or conditions set forth outside the standard clause. In that way, the Company argues, section XV's severance pay provision becomes part of the standard clause.

We reject that construction. In the first place, it runs contrary to the rules of grammar. "Grammatical construction of contracts generally requires that a qualifying phrase be construed as referring to its nearest antecedent." Gibbs v. Air Canada, 810 F.2d 1529, 1536 (11th Cir. 1987). Application of this rule requires the qualifying phrase to modify the term "employee." Read in this way, the phrase simply makes it clear that contributions are required only for those employees who are in the pertinent "job classifications covered by" the collective bargaining agreement. The phrase does not, as the Company suggests, subordinate the contribution requirement to terms or conditions set forth in other parts of the collective bargaining agreement.

This is not only the better grammatical construction of the clause, it is also the more plausible construction. The Company's interpretation renders the standard clause unnecessary. Under its interpretation, employers and local unions could amend or supplant the standard clause's contribution requirement simply by striking their own bargain and including it elsewhere in their collective bargaining agreement. If that were the case, requiring employers and unions to enter into the standard clause would be a pointless endeavor.

VIII

The Company's next argument challenges the validity of the trustees' 1971 resolution, which established the Fund's severance pay policy. The Company contends that the trustees exceeded their authority under the trust by adopting the resolution. The trust specifies:

> No amendment [to the trust agreement] may be adopted
> which will . . . be in conflict with the Collective Bargaining
> Agreements with the Local Unions as such agreements
> affect contributions to the Fund . . . .

13

The Company claims that the severance pay policy is, in effect, an amendment to the trust that conflicts with the severance pay provision of its collective bargaining agreement. For that reason, the Company argues that the severance pay resolution is invalid. The district court agreed.

The primary difficulty with this argument is the premise that the Fund's severance pay policy is in conflict with the Company's collective bargaining agreement. Such a conflict arises only if the collective bargaining agreement excludes severance pay contributions. But, the meaning of the collective bargaining agreement is the very issue in this case. As previously explained, the controlling language in the collective bargaining agreement is found in the standard clause, and, as we have seen, that language is consistent with the Fund's severance pay policy.

Furthermore, there is no evidence that shows the Fund's severance pay policy conflicted with any collective bargaining agreements at the time it was adopted. The policy was adopted in 1971, but the Company added its severance pay provision to its collective bargaining agreement in 1980.

Another difficulty with the Company's position is that the trustees' action did not amend the trust. By adopting the resolution, the trustees simply exercised their undisputed authority to establish the minimum amounts and rates of contributions required for participation in the Fund. Requiring severance pay contributions amounted to no more than an adjustment of the minimum requirements for participation.

IX

The Company also argues that the structure of the trust prevents the Fund from compelling it to make contributions based on severance pay. As previously noted, the trust specifies that the collective bargaining agreement determines an employer's rate of contribution. The trust regulations specify that, if an employer's collective bargaining agreement does not provide for the minimum contribution required to support that employer's benefit plan, as determined by the trustees, the Fund can disapprove the employer for participation. Relying on these provisions, the Company contends that disapproval is the only

14

course of action available to the Fund if a collective bargaining agreement fails to require sufficient contributions. Applying its reasoning to its own case, the Company argues that the Fund cannot retroactively impose a contribution requirement that was not specified in the collective bargaining agreement; rather, the Fund's only recourse was to disapprove the collective bargaining agreement.

The difficulty with this argument is apparent. The issue before us is not whether the Fund can impose contribution requirements in addition to those specified in the collective bargaining agreement, but rather, whether the collective bargaining agreement, properly interpreted, requires severance pay contributions. If that agreement requires the contributions, as we have decided it does, there is no doubt the Fund can recover the unpaid portion of those contributions.

X

As an alternative defense, the Company asserts that the Fund is equitably estopped from pursuing its claim. The Company claims that the Fund misled it by approving each of its collective bargaining agreements since 1980 even though those agreements included the severance pay provision. Because the Fund failed to inform the Company of the inconsistency between the severance pay provision and the standard clause, the Company contends that the Fund should be precluded from collecting the severance pay contributions.

In this circuit, equitable estoppel is not available to modify the written terms of an ERISA plan in the context of a participant's suit for benefits. Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58-60 (4th Cir. 1992). We need not decide now whether equitable estoppel, when premised on the misconduct of a multiemployer fund, is available as a defense to an action for delinquent pension contributions. The reason is that the facts in this case would not support such a defense even if it were available. See McCormick Dray Line, 85 F.3d at 1106.

Equitable estoppel "arises when one party has made a misleading representation to another party and the other has reasonably relied to his detriment on that representation." Black v. TIC Investment Corp., 900 F.2d 112, 115 (7th Cir. 1990). Reliance on the misrepresentation

15

is reasonable only if the party asserting estoppel does not or should not know the truth. Heckler v. Community Health Services of Crawford County, Inc., 467 U.S. 51, 59-60 n.10 (1984) ("If, at the time when he acted, such party had knowledge of the truth, or had the means by which with reasonable diligence he could acquire the knowledge so that it would be negligence on his part to remain ignorant by not using those means, he cannot claim to have been misled by relying upon the representation or concealment."); see also Cannon v. Group Health Service of Oklahoma, Inc., 77 F.3d 1270, 1276-77 (10th Cir. 1996) (listing common law elements of equitable estoppel).

Although the same person signed all the pertinent documents on behalf of the Company, it asserts that he was unaware of the Fund's severance pay policy when he signed the standard clause. Nevertheless, the Company should have known about the Fund's policy and about the inconsistency between section XV and the standard clause. The Fund sent at least three notifications of its policy to the Company, and the remittance forms, which the Company completed monthly from 1975 through 1993, conspicuously stated that severance pay contributions were required. It is evident that the Fund repeatedly disclosed its policy to the Company. In addition, because the Company reviewed and agreed to the standard clause on a regular basis, it was in as good a position as the Fund to detect the inconsistency between the standard clause and the severance pay provision. Heckler, 467 U.S. at 59-60 n.10. In fact, the Company is arguably in a better position to detect the inconsistency because it deals with one, not 1,100, collective bargaining agreements. The Company's equitable estoppel defense is unsupported by the facts.

XI

The Fund is entitled to prevail because the collective bargaining agreement, construed in light of section 515, requires the Company to make pension fund contributions based on severance pay. The ordinary meaning of the standard clause's integration language, upon which the Fund is permitted to rely, precludes enforcement of section XV's severance pay provision. As a result, the extent of the Company's obligation is controlled exclusively by the standard clause which, together with the trust's 1971 resolution, requires severance pay con-

16

tributions. Finally, the Company's equitable estoppel claim is not supported by the facts. Accordingly, we reverse and remand with instructions to enter judgment in favor of the Fund and move on to the computation of contributions.

REVERSED AND REMANDED